**Brian David CROFT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–03–00369–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 21, 2004.

Thomas Allan Martin, Houston, for appellants.

Joel H. Bennett, Galveston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and DRAUGHN.*

## OPINION

JOHN S. ANDERSON, Justice.

The jury convicted appellant Brian David Croft of sexual assault of a child and

* Senior Justice Joe L. Draughn sitting by as- signment.

assessed punishment at sixteen years confinement and a $10,000 fine. *See* Tex. Pen.Code Ann. § 22.011(a)(2) (Vernon Supp.2004). Appellant raises five issues on appeal. We affirm.

### Factual and Procedural Background

Appellant and A.C., a thirteen-year-old girl, met in an online chat room in May or June of 2001. They began talking on the phone, e-mailing, and instant-messaging each other at least every other day. A.C. told appellant she was thirteen when they first met in the chat room, and appellant told A.C. he was 22 years old. On July 25, 2001, A.C.'s fourteenth birthday, appellant asked A.C. to be his girlfriend. Sometime after her birthday, appellant told A.C. he was actually in his thirties. Appellant asked A.C. not to tell anyone about their relationship because he would get into trouble and may go to jail. She kept the relationship a secret because she believed they loved each other.

Appellant and A.C. agreed to meet on Saturday, September 22, 2001. A.C. testified that she wanted to look her best when she met appellant for the first time. On appellant's suggestion, she shaved her genital area to look like a picture of a nude woman he had sent her earlier. They agreed that A.C. would walk to Hobby Airport and appellant would pick her up. On the morning of September 22, they contacted each other by phone at approximately 5:00 or 5:30. A.C. was unable to walk to Hobby Airport because it was raining, so A.C. gave appellant directions to her house. A.C. was in the bathroom while she was talking with appellant on the phone when her mother, Marylou, came into the bathroom to get ready for work. She asked A.C. to leave the bathroom and then began taking a shower. At approximately 5:45 a.m., while her mother was in

the shower, A.C. left the apartment and met appellant on a nearby side street.

Appellant and A.C. went to Galveston, and appellant parked his car on the seawall. They started kissing, and appellant unzipped A.C.'s pants and put his fingers inside of her vagina. A.C. asked to see his genitals, so he unzipped his pants and then started masturbating. After he ejaculated, he grabbed a t-shirt from the backseat and wiped himself off.

Appellant and A.C. left the seawall and drove to a nearby Wal–Mart, where they bought a disposable camera. After taking pictures of each other, they decided to go see a movie, but because it was approximately 9:00 in the morning, the movie theater was not open. Appellant then took A.C. to an abandoned building, where they started kissing again. Appellant unzipped A.C.'s pants and asked her to pull her pants down to her knees. Appellant put his fingers inside of A.C.'s vagina and then unzipped his pants and asked her to perform oral sex on him, which she did. Appellant performed oral sex on A.C. and then tried to have sex with her. Appellant inserted his penis into A.C. a couple of inches, but he withdrew his penis when A.C. told him that it was hurting her. Appellant then ejaculated on A.C.'s genitals. A.C. wiped her genitals with the same tee shirt appellant used earlier.

After Marylou took her shower, she became alarmed with A.C.'s disappearance because it was very early on Saturday morning and it was not like A.C. to leave the apartment without telling someone. While Marylou and her family were searching for A.C., A.C.'s older sister found a piece of paper in the trash containing appellant's name and phone number. Marylou then looked up appellant's driver's license number and address on the computer from a website which publishes public information. Marylou also found an

e-mail from appellant to A.C. written during the previous week, stating that he could not wait until Saturday. Thereafter, Marylou informed the police about appellant and her belief that A.C. was with him.

After appellant and A.C. left the abandoned building, appellant received a phone call from his live-in girlfriend, Debra Kilgore. Marylou, along with her husband and other daughter, were at Kilgore's house. Kilgore gave the phone to Marylou who told appellant that she knew A.C. was with him. Appellant repeatedly denied having A.C. with him, but eventually gave in and said he would bring her back.

As they were leaving Galveston, appellant and A.C. tried to devise a plan to get A.C. back home without getting appellant into trouble with the police. They threw the disposable camera out of the window and then, upon appellant's suggestion, placed the tee shirt containing appellant's semen, in the Wal–Mart bag and threw it out of the window. Appellant then took A.C. to a gas station in League City and called Kilgore so that A.C. could tell her where she was located. Once they learned A.C.'s whereabouts, Officer Donald R. Patterson, a Pearland Police Officer present at Kilgore's house, asked Marylou to go to the police station while he recovered A.C.

While waiting for someone to pick her up, A.C. went to the gas station's bathroom and cleaned her genitals. Officer Patterson found A.C. at the gas station, and on the way back to the police station, Officer Patterson asked A.C. what happened. A.C. initially told Officer Patterson she and appellant had just talked because that is what appellant told her to say, but she eventually decided to tell him the truth. Because the incident took place in Galveston, Officer Patterson advised the family to go to the Galveston Police Department.

An officer with the Galveston Police Department asked Marylou to take A.C. to the hospital for an examination, and after the examination, the officer took Marylou's and A.C.'s statement. Thereafter, three officers with the Galveston Police Department, A.C., and A.C.'s parents left the police station to try to find the discarded evidence. They were able to locate the Wal–Mart bag containing the tee shirt and a receipt for a camera purchased earlier that day.

The Texas Department of Public Safety Houston Crime Lab tested the tee shirt and A.C.'s clothing for the presence of semen. The tee shirt, A.C.'s panties, and A.C.'s shirt tested positive for semen. The crime lab then performed DNA analysis on the tee shirt and A.C.'s panties. The semen found on the tee shirt matched appellant's DNA profile, but the DNA analyst was unable to obtain a DNA profile, other than A.C.'s, from the panties. The DNA analyst did not examine A.C.'s shirt. A.C.'s medical examination did not reveal any signs of trauma or sexual activity; however, the doctor concluded that neither could be ruled out.

Appellant was indicted for sexual assault of a child, and a jury found him guilty as charged in the indictment. In five issues, appellant challenges his conviction and punishment, contending (1) the trial court erred by omitting sex offender registration requirements from the jury charge during punishment; (2) the trial court improperly admitted expert witness testimony from the examining physician; (3) the trial court improperly admitted expert witness testimony from another physician; (4) the evidence is factually insufficient to establish the elements of the charged offense; and (5) the jury charge during the guilt/innocence stage of trial was defective because it was inconsistent with the indictment and lowered the State's burden of proof.

## DISCUSSION

### I. Jury Charge During Punishment

 In his first issue, appellant contends the trial court erred by failing to include all of the requirements of sex offender registration in the jury charge during punishment. Appellant alleges that simply listing the requirement that sex offenders register as a possible condition of community supervision was incorrect and incomplete. Appellant requested the trial court to include in the jury charge a complete description of all the requirements associated with sex offender registration. Appellant's request was denied. Instead, the jury charge provided the trial court may require appellant, as a condition of community supervision, to register as a sex offender.[1] Appellant contends in his brief that merely stating that he would "have to register" as a condition of community supervision is misleading and deceptive to the jury because the actual requirements of registration are much more onerous.

 A trial court is not required to submit the statutory terms of community supervision in the jury charge on punishment. *See Cortez v. State*, 955 S.W.2d 382, 384 (Tex.App.-San Antonio 1997, no pet.); *McNamara v. State*, 900 S.W.2d 466, 467–68 (Tex.App.-Fort Worth 1995, no pet.); *see also Yarbrough v. State*, 779 S.W.2d 844, 845 (Tex.Crim.App.1989) (per curiam) (dismissing petition as improvidently granted and expressly overruling *Brass v.*

*State*, 643 S.W.2d 443 (Tex.App.-Houston [14th Dist.] 1982, pet. ref'd), which had required inclusion of probation terms in the jury charge). Here, the jury was instructed that it could recommend community supervision if it assessed not more than ten years confinement, and that if the jury recommended community supervision, the judge could impose certain conditions on appellant, which included a non-exclusive list of general conditions. Appellant argues the inclusion of "Register as a sex offender" as a general condition of community supervision misled the jury because it did not provide the other mandatory requirements associated with such registration.

Appellant was convicted of sexual assault of a child under section 22.011(a)(2) of the Texas Penal Code. Chapter 62 of the Texas Code of Criminal Procedure provides that a person who has a "reportable conviction or adjudication" shall register with the local law enforcement authority in any municipality where the person resides or intends to reside for more than seven days. TEX.CODE CRIM. PROC. ANN. art. 62.02(a) (Vernon Supp.2004). The term reportable conviction or adjudication includes a conviction for a violation of Penal Code section 22.011, sexual assault. TEX. CODE CRIM. PROC. ANN. art. 62.01(5)(A) (Vernon Supp.2004). Thus, appellant was required to register as a sex offender, and comply with other pertinent provisions of that chapter when "released," as that term

---

1. The requirement that a person convicted of a "reportable conviction or adjudication" register as a sex offender is triggered by the following events: discharge, parole, placement in a nonsecure community program for juvenile offenders, or placement on juvenile probation, community supervision, or mandatory supervision. TEX.CODE CRIM. PROC. ANN. arts. 62.01(4), 62.03(a) (Vernon Supp.2004). The requirement that such a person register is mandatory. TEX.CODE CRIM. PROC. ANN. art.

62.02(a) (Vernon Supp.2004). The jury charge on punishment incorrectly described the probation condition that appellant register as a sex offender as a condition the trial court "may" impose. Had appellant received a sentence making him eligible for community supervision, appellant would have been required to register as a sex offender. *Id.* Appellant, however, does not raise this issue on appeal.

is defined in Code of Criminal Procedure article 62.01(4). TEX.CODE CRIM. PROC. ANN. art. 62.01(4). (Vernon Supp.2004).

The flaw in appellant's argument for more specificity in the jury charge is that the registration requirement of Chapter 62, applicable to a felon with a reportable conviction or adjudication, becomes a condition of community supervision when a person required to register as a sex offender is granted community supervision. TEX.CODE CRIM. PROC. ANN. art. 42.12, § 11(e) (Vernon Supp.2004). Under article 42.12 of the Texas Code of Criminal Procedure, a judge granting community supervision to a defendant required to register as a sex offender under Chapter 62 must require that defendant, *as a condition of community supervision*, to register under that chapter as a sex offender with local law enforcement and submit a blood sample for the purpose of creating a DNA record of the defendant. *Id.* Because the Chapter 62 registration requirement is a condition of community supervision, all other applicable terms of that chapter need not be listed in the jury charge at the punishment stage. *Means v. State*, 955 S.W.2d 686, 692 (Tex.App.-Amarillo 1998, pet. ref'd, untimely filed) (holding trial court not required to provide a complete list of each and every term and condition of probation); *Cortez*, 955 S.W.2d at 384 (holding trial court not required to submit the statutory terms of probation in the jury charge on punishment).

We conclude, therefore, the trial court did not err in refusing to include the complete list of requirements for sex offender registration in the jury charge at punishment. Appellant's first issue is overruled.

## II. Expert Testimony

In his second and third issues, appellant challenges the trial court's admission of the expert testimony of Dr. Mai and Dr. Lukefar.

### A. Standard of Review

We review the trial court's decision to admit or exclude scientific expert testimony under an abuse of discretion standard. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex.Crim.App.2002). The trial court abuses its discretion if it acts without reference to any guiding rules and principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App.1990). Thus, we will uphold the trial court's decision as long as it is within the zone of reasonable disagreement, given the evidence presented and the requirements of Rule 702 of the Texas Rules of Evidence. *Sexton*, 93 S.W.3d at 99.

The trial court is guided by Texas Rule of Evidence 702 in determining whether expert testimony should be admitted. *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App.1992). Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702. Rule 702 requires the proponent of the testimony to establish (1) the scientific, technical, or other specialized knowledge will aid the trier of fact, and (2) the expert is qualified to testify on the subject. *Gregory v. State*, 56 S.W.3d 164, 178 (Tex.App.-Houston [14th Dist.] 2001, pet. dism'd).

Under the first prong, the evidence is admissible only if the proponent of the scientific evidence shows through clear and convincing evidence that the proffered evidence is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in deter-

mining a fact in issue. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000); *Jordan v. State*, 928 S.W.2d 550, 554–55 (Tex.Crim.App.1996); *Roise v. State*, 7 S.W.3d 225, 234 (Tex.App.-Austin 1999, pet. ref'd). To be considered reliable, evidence derived from a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied. *Kelly*, 824 S.W.2d at 573. We also consider the following list of non-exclusive factors in evaluating reliability: (1) acceptance by the relevant scientific community; (2) qualifications of the expert; (3) literature concerning the technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying theory or technique can be explained to the court; and (7) the experience and skill of the person applying the technique. *Id.*

■ Rule 702 provides the various methods of establishing an expert's qualifications on a particular matter as knowledge, skill, experience, training, or education. *Carter v. State*, 5 S.W.3d 316, 319 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd). In order to determine whether an expert witness is qualified, we must measure the expertise against the actual subject matter about which the expert is offering an opinion. *Roise*, 7 S.W.3d at 234. Additionally, the expert testimony must be sufficiently tied to the facts of the case, so that it will aid the jury in resolving a factual dispute. *Jordan v. State*, 928 S.W.2d 550, 555 (Tex.Crim.App.1996). There must be a "fit" between the subject matter and the expert's qualifications; thus, the proponent must establish the expert has knowledge, skill, experience, training, or education with respect to the specific issue before the court. *Id.*

## B. Dr. Mai

■ Dr. Mai was a resident and A.C.'s examining physician at the emergency room in Galveston. He testified regarding the procedures used generally when examining a child alleging sexual abuse, as well as the specific examination and findings regarding A.C. He testified that he did not find any evidence of acute trauma to A.C.'s genitals or evidence of sexual activity; however, he concluded that neither could be ruled out. Dr. Mai also testified that during the examination, he did not have a device known as a colposcope, which magnifies the genital area. Appellant then objected to any testimony regarding a colposcope, arguing Dr. Mai was not qualified. After a voir dire examination, the trial court overruled appellant's objection, and Dr. Mai testified as follows:

Q. Dr. Mai, what is a colposcope?

A. It's an instrument to magnify what we're looking at. It's basically like a microscope except you don't look at a slide. You look at a large surface area.

Q. And how is that used in the examination of genitalia?

A. It's basically used to look at both the external and internal genitalia.

Q. And what is it used for specifically?

A. Basically to magnify what we're trying to look at.

Appellant contends (1) Dr. Mai was not qualified to discuss the colposcope, (2) the State failed to show the testimony would aid the trier of fact, and (3) Dr. Mai failed to tie the facts of the case to his testimony. At trial, however, appellant only objected to Dr. Mai's qualifications; therefore, we will limit our review of Dr. Mai's testimony to the objection made at trial—Dr. Mai's qualifications to testify about the colposcope.

Appellant specifically argues Dr. Mai was not qualified to testify about the colposcope because he lacked experience using the device and lacked personal knowledge in using, operating, and handling the colposcope. During voir dire, appellant's counsel questioned Dr. Mai about his education and training. Dr. Mai admitted he did not have any special training at medical school regarding a colposcope and that there was no colposcope in the emergency room where he examined A.C. Additionally, Dr. Mai testified he primarily works at the children's hospital, but that the children's hospital did not have a colposcope. Based on this testimony, appellant objected to Dr. Mai's testimony, arguing Dr. Mai never used a colposcope, was never trained regarding a colposcope, and the device was not located at the place where he primarily worked.

During the State's voir dire examination, Dr. Mai testified he was trained to collect sexual assault evidence kits at the ABC Clinic. While at the clinic, Dr. Mai observed a colposcope being used and, as part of his education and training, a doctor told him what a colposcope was and the purpose of the device. Dr. Mai testified he was not trained on how to use the colposcope because he was not expected to use the device. The trial court allowed Dr. Mai to testify about a colposcope, but limited his testimony to what the device was and what it did.

Rule 702 provides that an expert may be qualified by knowledge, skill, experience, training, or education. TEX.R. EVID. 702. During the voir dire examination, Dr. Mai testified that as part of his training, he was told what a colposcope was and what it did. The trial court limited Dr. Mai's testimony to those two specific areas; thus, the court properly tailored the testimony to the expert's actual qualifications. We cannot say the trial court abused its discretion in al-

lowing Dr. Mai's limited expert testimony. Accordingly, we overrule appellant's second issue.

### C. Dr. Lukefar

In his third issue, appellant contends the trial court erred in admitting Dr. Lukefar's testimony regarding (1) the likelihood of bleeding during a female's first sexual intercourse, and (2) the ability to detect semen on clothing versus skin surfaces. On appeal, appellant challenges both portions of Dr. Lukefar's testimony, claiming he was not qualified, the State failed to show the testimony would aid the trier of fact, and Dr. Lukefar failed to tie the facts of the case to his testimony. We will first address appellant's challenge to Dr. Lukefar's testimony concerning the likelihood of bleeding during a female's first sexual intercourse.

During trial, the State questioned Dr. Lukefar about whether the absence of medical findings of trauma or physical injury meant that sexual activity did not occur. The State then asked Dr. Lukefar whether a virgin always bleeds when she has sexual intercourse for the first time. Dr Lukefar responded, "No. Actually there's information in the medical literature that probably only about half or maybe a little more than half of woman [sic] actually have bleeding with their first—." Appellant interrupted Dr. Lukefar, objecting to the testimony on two grounds: (1) relevance; and (2) the reliability of the other medical literature referred to by Dr. Lukefar.

Appellant claims any testimony regarding bleeding is irrelevant because there was no evidence A.C. bled the day of the incident. Texas Rule of Evidence 401 defines "relevant evidence" as evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or

less probable than it would be without the evidence." Tex.R. Evid. 401. This broad definition of relevant evidence allows a liberal policy of admission of evidence for the jury's consideration. *Morales v. State,* 32 S.W.3d 862, 865 (Tex.Crim.App.2000). Here, the State argued, and A.C. testified, that she was a virgin when the incident occurred. Dr. Lukefar's testimony was relevant to explain lack of medical findings of trauma or physical injury and to determine whether appellant and A.C. engaged in sexual intercourse. Therefore, we hold the trial court did not abuse its discretion in allowing Dr. Lukefar's testimony regarding bleeding during a female's first sexual experience on relevancy grounds.

■ We next address whether the expert's testimony regarding bleeding satisfies the reliability prong. We will use the *Kelly* factors, as applicable, in evaluating whether Dr. Lukefar's testimony regarding bleeding was reliable. Dr. Lukefar is employed at the University of Texas Medical Branch ("UTMB") as a pediatrician, an associate professor in the department of pediatrics, and as medical director of the ABC Clinic. Dr. Lukefar has been practicing medicine in the area of pediatrics for over twenty years and has been teaching since 1993. He is board certified in pediatrics, has published papers in both peer-reviewed and non-peer-reviewed journals, is a consultant to other physicians and institutions, and is an authority in state medical societies on issues related to child sexual abuse.

Dr. Lukefar spends approximately fifty percent of his time working at the ABC Clinic, which is a facility for examining children that may be victims of child abuse or neglect. Dr. Lukefar has been the medical director for the ABC Clinic since 1996, and he also worked at a similar facility in Corpus Christi beginning in 1995. Approximately seventy-five percent of the children who visit the clinic are alleged victims of sexual abuse. Dr. Lukefar has examined approximately 3,000 children since 1995 who have alleged sexual abuse.

Dr. Lukefar also testified that he is considered by his peers to be an expert in the area of child abuse examinations. He testified his opinions are published for peer review, and the scientific field, pediatric medicine, is generally accepted within the scientific community. Dr. Lukefar stated that he knows and is qualified to testify regarding the changes that could occur in a child's sexual organ when that child engages in sexual activity. Additionally, Dr. Lukefar trains the residents at UTMB on how to conduct sexual assault examinations and evaluations of children. After providing his credentials, Dr. Lukefar then explained, with clarity, the different parts of the female sexual organ and how engaging in sexual activity could affect a child's sexual organ.

Applying the *Kelly* reliability factors, Dr. Lukefar testified the scientific theory was widely accepted, he has extensive credentials in the area of child sexual abuse victims, and he has written articles in peer-reviewed journals. He explained his opinions with clarity, and his experience and skill were well established. Based on Dr. Lukefar's extensive background, experience, and expertise in the area of pediatrics and child sexual abuse, the trial court could reasonably conclude Dr. Lukefar's testimony was sufficiently reliable to aid the trier of fact to understand the effects from a young female's first sexual experience, and was admissible. Accordingly, we hold the trial court did not abuse its discretion in allowing Dr. Lukefar to testify regarding the possibility of bleeding during a female child's first sexual intercourse.

■ Appellant also contends Dr. Lukefar was not qualified to testify on the subject of a child bleeding during her first sexual experience. Although Dr. Lukefar's experience in this area was well-established at trial, we do not need to reach this issue because appellant failed to object to Dr. Lukefar's qualifications in the trial court. Therefore, we hold this point of error is waived. TEX.R.APP. P. 33.1(a).

■ Appellant also challenges Dr. Lukefar's testimony regarding a physician's ability to detect semen on clothing versus skin. Appellant contends the State did not meet its burden to establish Dr. Lukefar was qualified or that his testimony would aid the trier of fact. During trial, the State asked Dr. Lukefar whether there was "any difference in viewing sperm on a child's body as opposed to on their clothing as a general matter." Appellant objected, claiming Dr. Lukefar was not qualified to answer the question because the subject was outside Dr. Lukefar's area of expertise, any testimony would be cumulative to the testimony previously given by the serologist, and it was not relevant. The trial court overruled appellant's objection.

■ Whether an expert's testimony will aid the trier of fact requires a determination of the relevancy and reliability of the testimony. *Roise,* 7 S.W.3d at 234. Here, because appellant only objected at trial to the relevancy of the testimony, we will not review Dr. Lukefar's testimony to determine whether it was also reliable. The evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Additionally, when deciding whether the trial court erred in admitting evidence for the jury's consideration, we apply the definition of relevant

evidence broadly. *Morales,* 32 S.W.3d at 865. Here, whether sperm was found on A.C.'s skin or clothing and a physician's method of viewing and collecting sperm directly relates to physical evidence that would make appellant's guilt or innocence more or less probable. Additionally, Dr. Lukefar discussed generally how to collect such evidence and related that information to A.C.'s medical records. Therefore, we hold Dr. Lukefar's testimony regarding detecting semen on clothing versus skin would aid the trier of fact.

■ Appellant also challenges Dr. Lukefar's qualifications to offer testimony concerning a physician's ability to detect semen on clothing and skin. We have previously detailed Dr. Lukefar's extensive experience in conducting examinations on children who are victims of sexual abuse. Dr. Lukefar also trains the pediatric residents of UTMB how to conduct sexual assault examinations and evaluations of children, including collecting possible evidence from the children during the examination. He testified the purpose of the examination and the collection of sexual assault evidence is to preserve evidence—for example, semen—that could identify the perpetrator. He also testified he would be able to explain laboratory and forensic findings, as well as how the samples are collected in an emergency room setting. Given Dr. Lukefar's knowledge, skill, experience, training, and education, we cannot say the trial court abused its discretion in allowing Dr. Lukefar to testify regarding detecting semen on a child's skin versus clothing.

We overrule appellant's third issue.

### III. Factual Sufficiency

■ In his fourth issue, appellant contends the evidence is factually insufficient to support the jury's verdict. We begin

the factual sufficiency review with the presumption that the evidence supporting the jury's verdict is legally sufficient. *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim. App.1996). In conducting a factual sufficiency review, we view all of the evidence in a neutral light, without favoring either party. *Johnson v. State,* 23 S.W.3d 1, 6–7 (Tex.Crim.App.2000). We will set aside the verdict only if (1) the evidence supporting the verdict, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt, or (2) contrary evidence, if present, is strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Zuniga v. State,* No. 539–02, 2004 WL 840786, at *7, 144 S.W.3d 477, at 484–85 (Tex.Crim.App. Apr.21, 2004); *see Zuliani v. State,* 97 S.W.3d 589, 593–94 (Tex.Crim.App.2003); *Johnson,* 23 S.W.3d at 11. When reviewing the evidence, we must give appropriate deference to the jury findings in order to prevent intruding on the fact finder's role as the sole judge of the weight and credibility of the evidence. *Johnson,* 23 S.W.3d at 7. Therefore, unless the record clearly reveals a different result is appropriate, we "must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor." *Id.* at 8.

In order to prevail, the State was required to prove appellant intentionally or knowingly caused his mouth, anus, or sexual organ to penetrate or contact A.C.'s sexual organ. TEX. PEN.CODE ANN. § 22.011(a)(2)(C) (Vernon Supp.2004). We have previously detailed the factual events that occurred on September 22, 2001, the day of the incident, in the factual and procedural background section. A.C. testified appellant attempted to have sex with her by putting his penis inside her, and that he stopped when she told him it was hurting her. Thereafter, he ejaculated on her genitals. Additionally, the scientific evidence, Marylou's testimony, and appellant's ex-girlfriend's testimony all corroborate A.C.'s version of the facts.

■ Appellant relies on the fact that the medical evidence was inconclusive regarding whether any sexual contact occurred as well as the fact that no sperm was found in the genital area of the complainant. Appellant's argument challenges the weight to be given the testimony; however, the jury is the sole judge of the credibility of the witnesses and the weight to be given the evidence. *Jones v. State,* 944 S.W.2d 642, 647–48 (Tex.Crim.App. 1996). Viewing the evidence in a neutral light, we cannot say the evidence of guilt, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt, or the contrary evidence is strong enough that the beyond-a-reasonable-doubt standard could not have been met. Accordingly, we hold the evidence is factually sufficient to support the jury's finding of guilt. We overrule appellant's fourth issue.

## IV. Jury Charge During Guilt/Innocence

In his fifth issue, appellant contends the trial court erred by presenting a defective charge to the jury during the guilt/innocence phase of trial. He contends the charge was defective because it was inconsistent with the indictment. Specifically, appellant argues that because the indictment alleged contact and penetration in the conjunctive, the jury charge was defective because it charged the jury in the disjunctive rather than the conjunctive. Appellant also brings, as part of this point of error, a second contention to the effect that by using the phrase "contact or penetration" in the jury charge, the trial court lowered or reduced the amount of proof

required by the State to prove appellant's guilt beyond a reasonable doubt. We disagree with both contentions.

### A. Charge Error: Failing to Follow the Indictment

■ The indictment in this case provides appellant intentionally and knowingly "cause[d] contact *and* penetration of the female sexual organ of a child, [A.C.], who was not the spouse of the Defendant, by the said BRIAN DAVID CROFT then and there using his penis." (emphasis added). The jury charge on guilt, however, provides "[n]ow if you find from the evidence beyond a reasonable doubt that on or about the 22nd day of September, A.D., 2001 in Galveston County, Texas, the Defendant, BRIAN DAVID CROFT, did then and there intentionally or knowingly cause contact *or* penetration of the female sexual organ of a child, [A.C.], who was not the spouse of the Defendant, by the said BRIAN DAVID CROFT then and there using his penis...." (Emphasis added).

In *Kitchens v. State*, a capital murder case, the court held that alternate pleading of the differing methods of committing one offense may be charged in one indictment. 823 S.W.2d 256, 258 (Tex.Crim.App.1991). Although the indictment may allege the differing methods of committing the offense in the conjunctive, *Kitchens* holds it is proper for the jury to be charged in the

disjunctive. *Id.*[2] We overrule the first part of appellant's fifth point of error.

### B. Charge Error: Disjunctive Wording Reduced State's Burden of Proof

■ Appellant next contends that harmful error occurred because the trial judge proceeded with a jury charge couched in the disjunctive as to contact or penetration, following an indictment that charged in the conjunctive as to contact and penetration. As a result of this alleged error, appellant argues the trial court lowered or reduced the amount of proof required by the State to prove appellant's guilt because the jury was permitted to convict on either contact or penetration. Appellant also contends that had the State been required to prove its case as charged in the indictment, it is conceivable that a jury may not have reached the same guilty verdict in light of the evidence brought forward during the trial.

Appellant fails to cite any authority supporting this alleged error. TEX.R.APP. P. 38.1(h). Nothing is preserved for appellate review. Moreover, the error is untenable in light of *Kitchens* and other authority holding it is proper to charge the jury in the disjunctive.

We overrule the second prong of appellant's fifth point of error. Because we have overruled both parts of this point of error, we overrule appellant's fifth point of error.[3]

---

**2.** Indeed, appellant cites *Kitchens* in his brief and acknowledges that contrary primary authority exists which holds that a conjunctive/disjunctive split between the indictment and the jury charge is not error, and such authority "resolves this point of error in the State's favor."

**3.** We are aware that in *Francis v. State*, 36 S.W.3d 121, 125 (Tex.Crim.App.2000), the Texas Court of Criminal Appeals held that it was error to charge the jury in the disjunctive where the instances of indecency with a child occurred on separate dates and constituted

separate offenses against the same victim. In *Francis*, the defendant argued that the disjunctive jury charge allowed a conviction on less than an unanimous verdict. 36 S.W.3d at 123. The State had introduced evidence of four *separate* incidents—two separate incidents when the defendant touched the victim's breasts, and two separate incidents when the defendant touched the victim's genitals. *Id.* at 124. The State elected to pursue a conviction based on two of the incidents, one involving touching the victim's breasts and one involving touching the victim's geni-

CONCLUSION

Having overruled appellant's five issues on appeal, we affirm the judgment of the trial court.

tals, and the jury charge inquired whether the defendant had "engaged in sexual contact by touching the breast or genitals." *Id.* The *Francis* court held the disjunctive jury charge allowed a conviction on less than an unanimous verdict. *Id.* at 125.

Here, appellant has not raised the unanimity issue in the trial court or on appeal, so the issue is not before us. Furthermore, unlike *Francis,* the separate offenses in this case involve *contact* or *penetration* of A.C.'s sexual organ with appellant's penis. The offense of penetration necessarily includes contact. *See Vick v. State,* 991 S.W.2d 830, 834 n. 2 (Tex. Crim.App.1999) (stating "penetration of the *genitals necessarily includes contact*"). There is no *Francis* error in this case, because all of the jurors who believed there was penetration necessarily also believed that antecedent contact had occurred, and a non-unanimous verdict was not possible.