Affirmed and Memorandum Opinion filed July 22, 2008








Affirmed and Memorandum Opinion filed July 22, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-01130-CR

____________

 

JASON DUBOIS SANDERS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 230th
District Court

Harris County, Texas

Trial Court Cause No. 1049456

 



 

M E M O R A N D U M  O P I N I O N

Jason Dubois Sanders challenges the finding that he was
competent to stand trial, asserting that the jury=s finding of
competency was against the great weight and preponderance of the evidence.  We
affirm. 








Sanders was charged with the felony offense of capital
murder.  He entered a plea of not guilty.  Sanders moved for a pretrial
competency hearing and the trial court convened a jury for that purpose.  The
defense presented the testimony of one expert witness in support of its
contention that Sanders was incompetent to stand trial.  The State responded
with the testimony of its own expert witness, as well as a former detention
officer, a deputy sheriff, a criminal-defense lawyer who previously represented
Sanders, Sanders=s former high-school principal, and
Sanders=s co-defendant. 
The jury found that the defense did not prove by a preponderance of the
evidence that Sanders was incompetent to stand trial.  

The case proceeded to trial and the jury found Sanders
guilty as charged.  The jury also answered three special issues: it answered
the issue of mental retardation in the negative, the issue of future
dangerousness in the affirmative, and the issue of mitigation in the
affirmative.  The trial court assessed punishment at confinement for life in
the Institutional Division of the Texas Department of Criminal Justice, without
the possibility of parole.  This appeal timely followed.  

In his first four of eight issues, Sanders challenges the
qualifications of the State=s expert witness, Dr. Denkowski.[1] 
But Sanders refers to no place in the record where he timely objected to Dr.
Denkowski=s qualifications.  On that point, therefore, Sanders
has failed to preserve any error.  See Croft v. State, 148 S.W.3d 533,
544 (Tex. App.CHouston[14th Dist.] 2004, no pet.) (citing Tex. R.
App. P. 33.1(a)).  Even if Sanders had preserved error, we find no support for
his argument that an expert who testifies at a defendant=s competency trial
must be appointed under article 46B.021 of the Code of Criminal Procedure, and
must therefore satisfy the qualifications and requirements listed in articles
46B.022, 46B.024, and 46B.025.  See Code Crim. Proc. Ann. art. 46B.021,
46B.022, 46B.024 (Vernon 2004); see also Code Crim. Proc. Ann. art.
46B.025 (Vernon 2005).








In the final four issues, Sanders essentially challenges
the factual sufficiency of the evidence.[2] 
A person is incompetent to stand trial if the person does not have A(1) sufficient
present ability to consult with the person=s lawyer with a
reasonable degree of rational understanding; or (2) a rational as well as
factual understanding of the proceedings against the person.@  Code Crim. Proc.
Ann. art 46B.003(a) (Vernon 2004).  An accused is presumed to be competent to
stand trial until he proves his incompetency by a preponderance of the
evidence.  Williams v. State, 964 S.W.2d 747, 750 (Tex. App.CHouston[14th
Dist.] 1998, pet. ref=d).  When evaluating the sufficiency of
the evidence offered to support the denial of Sanders's affirmative defense, or
any fact issue where the law has shifted to the defendant the burden of proof
by a preponderance of the evidence, the correct standard of review is whether
after considering all of the evidence relevant to the issue, "the judgment
is so against the great weight and preponderance of the evidence so as to be
manifestly unjust." Gallo v. State, 239 S.W.3d 757, 770 (Tex. Crim.
App. 2007) (quoting Meraz v. State, 785 S.W.2d 146, 155 (Tex. Crim. App.
1990)).








The jury heard evidence on both sides of the issue.  The
defense called Dr. Brown as its expert witness.  Before reaching his opinion,
Dr. Brown reviewed various documents including medical records, Mental Health
Mental Retardation Authority (MHMRA) records, and school records the State had
provided.  Dr. Brown also met with Sanders, his mother, and his maternal
grandmother, who had raised him.  Dr. Brown testified that Sanders was Aextremely slow
intellectually@ and that Sanders had trouble giving useful
information.  He performed a full intellectual evaluation of Sanders, using the
Weschler Adult Intelligence Scale-III (WAIS-III) to measure intellectual
capacity, or IQ.  Sanders scored a verbal IQ of 61, a performance IQ of 52, and
a full-scale IQ of 52.  Dr. Brown testified that the average IQ is between 90
and 110, the standard deviation is 15 points, and approximately 70 percent of
the population falls within one standard deviation above or below the mean.  Dr.
Brown opined that Sanders was mildly to moderately retarded, which is
considered high-functioning retardation, and that his impairment was
permanent.  He told the jury that Sanders= understanding of
his case was Avery, very simple and very, very primitive.@  

In Dr. Brown=s opinion, Sanders
was incompetent to stand trial due to mental retardation.  Sanders could not
rationally understand the charge against him or the consequences of that
charge, and he did not have the ability to consult with his lawyers with a
rational degree of factual understanding.  Although he thought Sanders could
exhibit appropriate courtroom behavior, he did not think that Sanders could
understand the adversarial nature of the proceedings.  When asked if he thought
Sanders could testify, Dr. Brown responded that Sanders easily misunderstands
questions and would be Atotally at the mercy of an intelligent
manipulation of cross examination.  He would not be able to fend for himself at
all in this situation.@  

On cross, Dr. Brown admitted that he did not review the
previous IQ tests given to Sanders.  Sanders had previously scored an 83 and an
89 on the WISC, which is the children=s version of the
WAIS-III administered by Dr. Brown.  Sanders had also previously scored a 104 and
106 on the TONI test of nonverbal intelligence.  Further, Dr. Brown did not
review the statement of the co-defendant, any statement made by Sanders, the
Houston Police Department offense report, the video recording of the offense,
or Sanders=s cell-phone records.  Additionally, Dr. Brown did not
speak to any officers or witness, any doctors that had previously evaluated
Sanders, any of his teachers or friends, any lawyer who may have previously
represented Sanders, jail personnel, or the co-defendant. 








The State presented six witnesses to counter the contention
that Sanders was incompetent to stand trial, including its own expert, Dr.
Denkowski.  Prior to testifying, Dr. Denkowski reviewed Sanders= school records,
the Harris County jail records, the Houston Police Department offense report,
the available test protocols for Houston Independent School District, Dr. Brown=s reports and
findings, a statement from Sanders, a statement from his co-defendant, and
MHMRA records.  The jury heard from Dr. Denkowski that an IQ of 55 to 70 is in
the range of mild retardation, and an IQ of 40 to 55 is in the range of
moderate retardation.  Regarding the score of 52 that Dr. Brown assessed, Dr.
Denkowski testified that a 

person with an IQ of 52 is pretty functionally impaired.  They=reCamong other things, they=re not going to be able to give you
very good information about themselves.  A lot of self-help skills aren=t going to be there.  This is not a
person that=s going to go out and buy their own
clothes.  That is not a person that is going to be able to drive a car.  It
would be too confusing. . . .  They would never be able to achieve a
sixth-grade level academically.

Dr.
Denkowski listed numerous tasks that he would not expect an individual with an
IQ of 52 to be able to perform, including: drive a car without getting lost,
drive a car alone, successfully play a video game, wear clean clothes, brush
his teeth on a daily basis, use a cell phone, buy groceries on his own on a
regular basis, and purchase and install a security system.   

Dr. Denkowski also testified that he had administered three
tests on Sanders for malingering: the test of memory malingering (TOMM), the
dot-counting test, and the rate-15-item memory test. Malingering is Aan exaggeration of
symptoms when one is in trouble because of our human nature to protect
ourselves.@  Ex parte Modden, 147 S.W.3d 293, 306 (Tex. Crim.
App. 2004).  He noted that Sanders appeared to understand his questions, rarely
asked for clarification, and was able to carry on a conversation.  When asked
his opinion as to whether or not Sanders was malingering, Dr. Denkowski
responded: Adefinitely.@  He explained
that 








the best of these three tests is
the test of memory malingering.  And my experience has been that even the
defendant who is found to be mentally retarded will get like 45 or 47 out of
50.  Those who have not been mentally retarded if they have been trying, will
invariably get 50 on the first try.  And you try this three times.  You go
through the sequence three times.  With Mr. Sanders, he got 15 out of 50 the
first time and then 19 out of 50 on the second two tries.  That was virtually
unheard of.

Dr. Denkowski also administered the
Stanford Binet Intelligence Scale, Fifth Edition, and stated that this test was
Abasically an
equivalent to the [test] that Dr. Brown gave.@  Sanders scored a
40, which Dr. Denkowski stated was the Alowest possible
score you can get on that test. . . . [Sanders] was functioning like a
47-month-old toddler in terms of mental ability.@  Dr. Denkowski
also administered the Beck Anxiety Inventory and the Beck Depression Inventory,
and did a wide-range achievement test for spelling, reading, and math skills. 
He found that Sanders was functioning at a first-grade level.  However, he
noted that when Sanders was almost 17 years old, he was given an
arithmetic-achievement test which indicated that he functioned at a sixth-grade
level.  He told the jury that at a sixth-grade level, Asomeone can
multiply and divide double digits, numbers, have an understanding of
fractions.  But when I tested Mr. Sanders= math skills, he
miscalculated problems like two plus seven, five minus one.@  Based on this,
Dr. Denkowski formed the opinion that Sanders Awas trying to
conceal whatever level of academic skills he possessed.@  








Next, Dr. Denkowski determined Sanders=s adaptive
behavior.  Adaptive behavior refers to Athe effectiveness
with or degree to which a person meets the standards of personal independence
and social responsibility expected of the person=s age and cultural
group.@  Tex. Health
& Safety Code Ann. ' 591.003(1) (Vernon 1994).  To determine
Sanders=s adaptive
behavior, Dr. Denkowski used information already available from the record,
including the interviews performed by Dr. Brown.  He also interviewed Sanders=s girlfriend at
the time, the co-defendant, and Sanders= former
high-school principal.  He told the jury that he did not interview Sanders=s grandmother
because she had already provided a rating, which gave Sanders credit for the
ability to perform twice as many skills as he indicated he could perform. 
Sanders indicated that he could perform 43 of the 239 skills listed.  Dr. Brown
had assessed Sanders=s adaptive behavior at a 41.  Dr.
Denkowski informed the jury that a 40 is the lowest score possible.  Dr.
Denkowski assessed Sanders=s adaptive behavior at 75, though he noted
that A75 is really an
artificially low score.@  He opined that Sanders did not have
significant deficits in adaptive behavior.  On cross, he admitted that he did
not go over the protocols from previous intelligence-assessment tests given to
Sanders so he could not verify the previous results, and he had not addressed
the considerations listed for determining competency under the Code of Criminal
Procedure.

The second witness for the State was a former detention
officer.  He testified that Sanders was involved in a rule violation and was
subsequently given an opportunity to write down a statement explaining what
happened.  The State admitted Sanders=s written
statement into evidence, though the statement was redacted to omit any mention
of fighting.  The detention officer testified that he did not write the
statement for Sanders and that Sanders was alone in a separation cell when he
wrote the statement.  The State=s third witness had spoken with Sanders
about his options after the rule violation.  He testified that it seemed like
Sanders understood, Sanders did not indicate that he could not understand, and
Sanders made a decision based on the options he was given.  However, on cross,
both witnesses admitted that they did not specifically remember Sanders and
that they were testifying based on their reports.  








The fourth witness for the State was Sanders=s former
high-school principal.  She testified that she heard Sanders was Aan up-and-coming
star@ in track, and
that he Acould always find
a way to make it appear that he was innocent even if I had witnessed what
happened.  And the way that he would respond to questioning about what had
occurred made me realize that he was manipulative.  He was very skilled in that
area.@  She also
testified that Sanders was in special education and speech therapy, and that he
had a reading disability.  The fifth witness for the State was an attorney who
previously represented Sanders on a criminal case.  She testified that she had
no competency concerns during her representation of Sanders; however, she
admitted that she had no independent recollection of Sanders and that she was
testifying from practice of habit and a review of the record.  She also
admitted that she had not spoken to Sanders since September of 2004.  The sixth
and final witness for the State was the co-defendant.  He testified that he
lived with Sanders for two years and that he had seen Sanders cook something in
a microwave, ride a bicycle, drive a car, use a phone, play video games, buy a
ticket at a movie theater, go shopping for clothing, brush his teeth, buy
groceries, give his phone number to others, order his own food, clean the
house, and lie to his girlfriend.  On cross, he admitted that he was testifying
in return for leniency.

After hearing evidence on both sides of the issue, the jury
rejected Sanders=s claim that he was not competent to stand
trial.  We must not intrude upon the fact finder=s role as the sole
judge of the weight and credibility given to any witness=s testimony.  See
Fuentes v. State, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). 
Appropriate deference should be afforded to the fact finder=s conclusion on
the issue of whether Sanders was competent to stand trial.  See Williams v.
State, 191 S.W.3d 242, 250-51 (Tex. App.CAustin 2003, no
pet.).  A jury resolves conflicts in evidence by weighing testimony and then
rejecting any or all of a witness=s testimony.  Wesbrook
v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).  Sanders claims that
there was no conflict in the evidence because the State did not offer any
evidence to refute Dr. Brown=s testimony that Sanders was legally
incompetent.  We disagree.  The State offered the testimony of Dr. Denkowski
that Sanders was malingering, and this testimony alone clearly provides a
conflict in the evidence.  








Although the jury heard from Dr. Brown that Sanders was
incompetent because of his mental retardation, the jury also heard from Dr.
Denkowski that Sanders Awas trying to conceal whatever level of
academic skills he possessed.@  Dr. Denkowski opined that Sanders was Adefinitely@ malingering, and
that he did not have significant deficits in adaptive behavior.  Additionally,
the jury heard testimony from two witnesses regarding a rule violation after
which Sanders wrote his own statement, and made a decision about how to proceed
based on the options he was given.  The jury also heard from a criminal-defense
attorney who had previously represented Sanders.  She testified that she had no
competency concerns during her representation.  Sanders=s former principal
testified that Ahe was manipulative.@  Finally, his
co-defendant testified that Sanders was able to perform various tasks which Dr.
Denkowski had previously explained would not be  possible for an individual
with an IQ of 52, the IQ score Dr. Brown had assigned to Sanders.  After an evaluation
of the evidence presented, we conclude that the jury=s finding of
competency is not so against the great weight and preponderance of the evidence
as to be manifestly unjust.  See Meraz, 785 S.W.2d at 155. 

Based on the foregoing, we affirm the judgment of the trial
court.

 

 

 

 

 

/s/      Jeff Brown

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed July 22, 2008.

Panel consists of
Justices Yates, Anderson, and Brown.

Do Not Publish C Tex. R. App. P. 47.2(b).

 









[1]  Sanders asserts that Dr. Denkowski is not qualified
because (1) he did not testify or otherwise prove that he was licensed in the
State of Texas, (2) he had no experience or training related to insanity or
incompetency evaluations, (3) he made no written report as to Sanders=s competency, and (4) he did not address the factors
to be considered in a competency evaluation.   





[2]  Specifically, Sanders questions whether (1) the
testimony of Dr. Denkowski is sufficient to counter the testimony of Dr. Brown,
(2) the testimony of lay persons who have not had recent contact with Sanders
is sufficient to rebut his claim of legal incompetency, (3) a person can be
legally incompetent without being mentally retarded or mentally ill, and (4)
the jury=s verdict was so against the great weight and
preponderance of the evidence as to be manifestly unjust and require reversal
of his conviction.