

WANDA McKEE FOWLER
fowler@wrightclose.com
Retired Justice of the
14th Court of Appeals 1995 – 2008
Direct: (713) 490-4025

ACCEPTED
06-14-00040-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
4/10/2015 10:25:55 AM
DEBBIE AUTREY
CLERK

April 10, 2015

RECEIVED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

4/10/2015 10:25:55 AM

DEBBIE AUTREY
Clerk

Court of Appeals
Sixth Appellate District of Texas
Attn.: Debra K. Autrey, Clerk
Bi-State Justice Building
100 North State Line Avenue #20
Texarkana, Texas 75501

> Re: No. 06-14-00040-CV; *Tillerd Ardean Smith, Medallion Transport & Logistics, LLC, and Tomy Rushing d/b/a Rushing Transport Services, Inc. v. Brandi Williams*

Dear Ms. Autrey:

This post-argument letter brief is filed to answer several questions asked by the justices at oral argument, held on April 1, 2015. Please forward this letter to the justices.

**Spoliation Questions**

*Justice Moseley asked whether a spoliation finding is a question of fact or one of law*. In both *Brookshire Brothers, Ltd. v. Aldridge* and *Wackenhut Corp. v. Gutierrez*, the Texas Supreme Court held that whether a party has spoliated evidence and the particular remedy needed are questions of law for the court. *Wackenhut Corp. v. Gutierrez*, No. 12-0136, 2015 WL 496301, * 4 (Tex. February 6, 2015); *Brookshire Bros., Ltd v. Aldridge*, 439 S.W.3d 9, 14, 20 (Tex. 2014).

*The Court also asked if the trial judge needed to make a finding that a lesser sanction would not adequately address the prejudice any spoliation caused*. *Brookshire Brothers* answers that question affirmatively: "In the event the trial court makes … a finding [of intentional spoliation] *and concludes*, as with any sanction, *that a lesser remedy would be insufficient* to ameliorate the prejudice caused by the spoliating party's conduct, *the trial court is within its discretion in submitting a spoliation instruction*." *Brookshire Bros. v. Aldridge*, 439 S.W.3d at 25. In short, without a finding that a lesser sanction would be insufficient to remedy any prejudice caused, the trial court does not have the discretion to issue a spoliation instruction. *Id*. The trial court below did not enter this necessary finding.

Not only did the judge not discuss whether a lesser remedy would be appropriate, the court also did not discuss *any* prejudice that may have occurred to Plaintiff. *Id*. To determine prejudice, a court must assess considerations Justice Baker referred to in his concurrence in *Trevino v. Ortega*, 969 S.W.2d 950, 954 (Justice Baker, concurring). These considerations include "the relevance of the spoliated evidence to key issues in the case, . . . whether the evidence would have been helpful to the nonspoliating party's case. . ., and whether the spoliated evidence was cumulative of other competent evidence that may be used instead of the spoliated evidence." *Brookshire Bros*., 439 S.W.3d at *21 – 22. The trial court did not evaluate these considerations. Moreover, Medallion has argued that the evidence produced (i) enabled the Plaintiff to argue that Smith drove while fatigued and that Smith falsified records, and (ii) covered the relevant driving periods. The record confirms that Plaintiff was able to ask many questions about both fatigue and falsification of records; consequently, there was no prejudice.

*The Court also asked whether the record supports the trial court's finding that Medallion intentionally spoliated evidence*. To find intentional spoliation, a court must conclude that a party "*deliberately* destroy[ed] evidence." *Id*. at *23 (emphasis in original). The court further explained that the instruction must be reserved for those who exhibit "flagrant bad faith." *Id*. This record contains no evidence of an intent to destroy relevant evidence or of flagrant bad faith by Medallion. To begin, though Plaintiff sent a letter asking Medallion to preserve certain types of evidence, Plaintiff did not specify how many days or months to preserve of each type of evidence; Plaintiff sent the letter several days after the accident and did not communicate with the company again until suit was filed almost two years later. Bill Winney, Medallion's COO, confirmed that it was Medallion's practice to preserve 7 days of driver's logs; when the company received Plaintiff's discovery asking for more than 7 days of logs, the logs had already been destroyed under the normal course of business operations. (4 RR 79–80) In fact, Winney testified that the company did not understand that it had to preserve 6 months of logs for this case, that it had never preserved 6 months of logs, and that it preserved all documents that it normally would preserve for an accident. (4 RR 117–19) Under *Brookshire Brothers*, this does not constitute intent to conceal or destroy relevant evidence. *Id*. at * 27–28.

To prove intentional spoliation, the Plaintiff appears to rely primarily on the testimony of Cathy McMullen, a dispatcher for Medallion who said that after the passage of 6 months she destroyed all of the documents she had. However, McMullen testified that she did not destroy any documents until she had sent copies of all documents to Medallion headquarters. Again, this does not qualify as intentional destruction of relevant evidence.

*Finally, Justice Burgess asked whether the defendants' failure to object to the spoliation testimony waived any complaint on appeal regarding its admittance*. Before *Brookshire Brothers*, the law was unclear regarding the admissibility of spoliation evidence; for the first time in *Brookshire Brothers*, the Supreme Court held that spoliation evidence is inadmissible: "Our holding that the trial court, not the jury, bears responsibility for making the required spoliation findings and imposing a remedy affects the propriety of admitting evidence regarding spoliation at trial." *Id*. at *26. Because this was a new holding by the Supreme Court, counsel did not waive any objection to this evidence.

Moreover, in *Brookshire Brothers*, the Supreme Court also held, "there is no basis on which to allow the jury to hear evidence that is unrelated to the merits of the case, but serves only to highlight the spoliating party's breach and culpability." *Id*. "While such evidence may be central to the trial court's spoliation finding, it has no bearing on the issues to be resolved by the jury." *Id*. Much evidence relating only to spoliation was admitted in this trial. Spoliation testimony also came into evidence in *Brookshire Brothers*. *Id*. at *16. Although the court did not discuss whether an objection was made, its discussion on the inadmissibility of the evidence makes it appear that an objection may not have been made, because the court held simply that the evidence was inadmissible, not that the trial court wrongly overruled an objection to the evidence. *Id*. at *26. For this reason as well, the error was preserved even without an objection.

**No evidence to support the negligent hiring/training instructions and jury findings**.

*Pointing out that defense counsel began his objections to the negligent hiring/training instructions by arguing that they were a comment on the weight of the evidence, Justice Burgess asked whether defense counsel raised a no-evidence objection*. (7 RR 140) The Texas Supreme Court "favor[s] a common sense

application of our procedural rules that serves the purpose of the rules, rather than a technical application that rigidly promotes form over substance." *Thota v. Young*, 366 S.W.3d 678, 690 (Tex. 2012). Under this common-sense application, the only test is "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Id.* at 689.

For several reasons, counsel preserved an objection to these instructions on the ground that no evidence supported them. First, even assuming that counsel objected only that the instructions were comments on the weight of the evidence (which defendants do not concede), he clearly said they were improper because Smith had never had a moving violation or done anything as a truck driver to suggest that he was an incompetent employee. At its essence, this argues that the instruction was an improper comment on the weight of the evidence because no evidence supported the instruction. Second, it appears that counsel was making two objections rather than only one because counsel first said it was a comment on the weight of the evidence, and then discussed evidentiary problems with the instruction, saying "and it's improper for that reason." Read broadly, this was an evidentiary objection as well.

Regardless of whether the court reads this as one objection or two, the court was made aware that the evidence didn't support the instruction. This is sufficient to preserve error. *See State Dept. of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 239 (Tex. 1992) (stating that the court "was certainly aware that the issue was disputed").

In addition, in their motion for judgment notwithstanding the verdict and their motion for new trial Defendants argued to the trial court that no evidence supported either the instruction or the jury findings of negligence based on negligent hiring and negligent training. (CR 699–718, 752–62)

Finally, these instructions were harmful because they injected a negative driving history for Smith when there was none at all. When considered in conjunction with the spoliation instruction, they tipped the balance of the case in favor of Plaintiff and against all defendants. Regardless of whether these instructions could be appropriate in some situations, they were improper in this situation.

**Whether Plaintiff proved that Smith was Rushing's employee**.

*On whether Rushing is vicariously liable for Smith's actions, the Court questioned whether Rushing had an obligation to secure a finding that Smith was not Rushing's employee*. The short answer is "no." An actor's status as an employee is an element of a plaintiff's negligence claim against the employer. *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). To determine if a person is an employee, a court considers the extent to which the company controls the details of the employee's work. *See* PJC 10.1. If employment was a fact issue, Plaintiff had to ask a question to establish employment. *Guerra*, 348 S.W.3d at 228. Here, Plaintiff made Smith's employment by Rushing a fact issue by refusing to stipulate that Smith was Rushing's employee. As a result, a question should have been submitted to the jury to establish that Smith was an employee. *Id*. If an element of a claim is left out of a charge without objection it can be deemed to have been found by the court. *Id*.; *see also* Tex. R. Civ. P. 279. But this general rule should not apply here because—during the charge conference—Plaintiff's counsel refused to stipulate that Smith was Rushing's employee. (7 RR 141–42)

Plaintiff benefitted by refusing to stipulate that Medallion and Rushing were vicariously liable for Smith's action because Plaintiff's counsel was able to push for three blanks for defendants instead of just one. Several courts have held that a separate blank should not be submitted for employers for negligent hiring and training if the employer is vicariously liable for the defendant's actions. See, *Simmons v. Bisland*, No. 03-08-00141, 2009 WL 961522, *4 (Tex. App.—Austin April 9, 2009, pet. denied); *Rosell v. Central West Motor Stages, Inc.*, 89 S.W.3d 643, 654 (Tex. App.—Dallas 2002, pet. denied); *Williams v. McCollister*, 671 F. Supp. 2d 884, 887–89 (S. D. Tex 2009). This Court should not allow Plaintiff to now switch positions and thereby benefit from this tactical decision Plaintiff's counsel made.

**Whether discussions of expert qualifications in healthcare-liability cases apply to experts in personal injury cases**.

*Justice Moseley asked if experts in personal injury cases are subject to the same inquiries as experts in healthcare liability cases*. At its core, this question seems to ask if one who testifies in a personal-injury case may be less qualified than a medical expert who testifies in a healthcare-liability case. The answer to this

question must be "no." There is no authority that requires an expert in a healthcare-liability case to meet a more heightened standard than a medical expert in a personal-injury case.

The standards by which courts evaluate all scientific testimony were not developed in and are not exclusive to the healthcare-liability context. *See, e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) (product liability action); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995) (same). These standards derive from evidentiary rule 702. *Id*. The Texas Supreme Court case on which Defendants rely in their briefing—*Broders v. Heise*, 924 S.W.2d 148 (Tex. 1996)—is indeed a medical malpractice case, but the rule it announced for expert qualifications has been reiterated in other contexts. *See, e.g.*, *Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) (relying on *Broders* qualification analysis in consumer lawsuit for proposition that trial courts "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion"); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998) (relying on *Broders* qualification analysis in wrongful death and products liability action). The ultimate inquiry in any case in which expert testimony is offered is whether the purported expert truly has expertise on the actual subject about which he offers an opinion. *See ExxonMobil Corp. v. Pagayon*, No. 14-13-00456-CV, slip op. at 22–24 (Tex. App.—Houston [14th Dist.] Apr. 9, 2015, no pet. h.), *available at* http://www.search.txcourts.gov/Case.aspx?cn=14-13-00456-CV&coa=coa14 (stating, in healthcare liability case, that matter of doctor's qualification to testify on causes and effects of injury must be measured under *Broders* and TEX. R. EVID. 702, which involve same inquiry as under Health Care Liability Act).[1] The only additional standard the Healthcare Liability Act imposes on a healthcare-liability medical expert is that he knows the standard of care that applies to the particular actions at issue. TEX. CIV. PRAC. & REM. CODE § 74.401(a)(3).

The issue here is not whether Dr. Calodney is qualified to offer a basic medical opinion on the standard of care or whether the impact of the collision caused pain or injury. Even though he is not a surgeon, Dr. Calodney provided

---

[1]    A copy of this recent opinion from the Fourteenth Court of Appeals, and the accompanying dissent, is attached to this letter for the Court's convenience.

scientific testimony that Plaintiff needed one of two specific spinal surgeries and, as a result of surgery, would never be able to work again. The specific treatment needs and effects about which he opined are analogous to those addressed in the other healthcare liability cases cited by Defendants. *See, e.g.*, *Tawa v. Gentry*, No. 01-12-00407-CV, 2013 WL 1694869, at *3–8 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (considering doctor's qualification to opine about discontinuing specific treatment); *Cortez v. Tomas*, No. 02-11-00231-CV, 2012 WL 407382, at *3–6 (Tex. App.—Fort Worth Feb. 9, 2012, no pet.) (considering doctor's qualification to opine on specific surgical procedure and postoperative care). Accordingly, the cases cited are the clearest illustration of the careful inquiry this Court must make in determining whether Dr. Calodney's testimony about specific lumbar surgeries and their postoperative effect is competent evidence in support of the large sums the jury awarded for future medical expenses, future physical impairment, and future lost wages.

Respectfully Submitted,

*/s/ Wanda McKee Fowler*
Wanda McKee Fowler

**Attorney for Appellants**

Court of Appeals
Sixth Appellate District of Texas
Attn.: Debra K. Autrey, Clerk
April 10, 2015
Page 8

*cc: Via Electronic Service*

David M. Gunn
Erin H. Huber
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, TX 77010
dgunn@beckredden.com
ehuber@beckredden.com

John R. Mercy
MERCY CARTER TIDWELL LLP
1724 Galleria Oaks Drive
Texarkana, Texas 75503
jmercy@texarkanalawyers.com

Brent Goudarzi
Geoffrey G. Hoover
GOUDARZI & YOUNG
P.O. Box 910
Gilmer, Texas 75644
brent@goudarzi-young.com
ghoover@goudarzi-young.com

*Counsel for Appellant*



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00456-CV

---

### EXXONMOBIL CORPORATION, Appellant

### V.

### DELIA PAGAYON, MICHELLE FULTON, ALFREDO G. PAGAYON, MICHAEL G. PAGAYON, AND THE ESTATE OF ALFREDO M. PAGAYON, Appellees

---

**On Appeal from the Probate Court No. 2**
**Harris County, Texas**
**Trial Court Cause Nos. 408,329-401 & 408,329**

---

## O P I N I O N

Alfredo M. Pagayon ("Alfredo") died several weeks after an altercation between himself, his son Alfredo G. Pagayon ("J.R."), and an ExxonMobil Corporation employee at an ExxonMobil service station/convenience store. ExxonMobil challenges the judgment rendered on the jury's verdict in favor of Alfredo's wife, children, and estate (collectively, "the Pagayons") on their claims

arising from Alfredo's death. ExxonMobil asserts that the judgment should be reversed because (1) it had no duty to control its employee under the facts of this case, (2) the evidence is legally and factually insufficient to support a finding that its negligent supervision caused Alfredo's death, (3) issues of causation and comparative fault were not fairly tried because the trial court refused to allow ExxonMobil to present certain evidence and defenses, (4) the evidence is insufficient to support the medical-expenses damages awarded, and (5) a remittitur of Alfredo's widow's non-pecuniary damages should be suggested because her pain and mental anguish were due almost entirely to events that occurred during Alfredo's hospitalization and not to the fight at the convenience store. We conclude that ExxonMobil is not entitled to rendition of a take-nothing judgment on any of the asserted grounds, that is, we conclude that ExxonMobil had a duty to control the employee who injured Alfredo, and there is legally sufficient evidence that its breach of that duty caused Alfredo's death. However, we agree with ExxonMobil that the trial court erred in striking its designation of an emergency-room physician as a responsible third party. We further conclude that the error probably caused the rendition of an improper judgment; thus, without reaching ExxonMobil's remaining issues, we reverse the judgment and remand the case for a new trial.

## I. INTRODUCTION

J.R. Pagayon and Carlos Cabulang were both employed by ExxonMobil as sales associates at a convenience store in the Houston area. Cabulang, J.R., and J.R.'s father Alfredo had known each other prior to the employment. J.R. had conflicts with Cabulang at work and reported those problems not only to his ExxonMobil manager, but also to Alfredo. On July 31, 2011, Alfredo telephoned

2

Cabulang and the two had heated words about the conflict between J.R. and Cabulang.

The next day, Cabulang and J.R. worked together. During that time, Cabulang repeatedly cursed J.R. and said things to him that J.R. described as threats against himself and Alfredo. A co-worker told store manager Roce Asfaw of Cabulang's threats against J.R., but Asfaw simply told the co-worker to tell J.R. to stay away from Cabulang. J.R. did so, but when Alfredo came into the ExxonMobil store to pick up J.R. from work that afternoon, Cabulang left his sales register and started a fight with Alfredo. Cabulang struck Alfredo several times in the head and back, and Alfredo was transported to a hospital for treatment of his injuries. He was treated in the emergency room by Dr. Hung Hoang Dang until after midnight, then admitted to the hospital. Shortly thereafter, Alfredo was transferred to the intensive-care unit for treatment of his respiratory distress, and Dr. Jaime Clavijo intubated him. An attempt to wean Alfredo from the respirator failed, and he was transferred to a long-term intensive-care facility. On August 24, 2011, Alfredo died. The stated cause of death was cardiac arrhythmia, renal failure, and respiratory failure. According to Dr. Clavijo, the organ failure was caused by sepsis, a blood infection. The source of the infection was not definitively identified, and the parties' respective medical experts had differing opinions regarding the most probable source.

The Pagayons sued ExxonMobil, seeking to hold it directly or vicariously liable for Alfredo's injury and death. The Pagayons attributed Alfredo's death solely to the events at the store. ExxonMobil maintained that it was not liable for any harm that Alfredo sustained in the fight, and in any event, his death was caused by negligent medical care. ExxonMobil sought to designate Dr. Dang as a responsible third party, but the Pagayons successfully moved to strike the

3

designation. They also successfully moved to exclude the testimony of ExxonMobil's medical expert, Dr. Jose Gregorio Casar.

The jury failed to find that Cabulang's actions were within the course and scope of his employment; thus, ExxonMobil was not held vicariously liable for its employee's actions. The jury did find, however, that ExxonMobil was directly liable for its negligent supervision of Cabulang, and that this negligence, together with the negligence of both J.R. and Alfredo, proximately caused Alfredo's death. The jury was then asked to apportion liability for the fight among ExxonMobil, J.R., and Alfredo. It attributed seventy-five percent of the responsibility for causing the fight to ExxonMobil, fifteen percent to J.R., and ten percent to Alfredo. Finally, the jury assessed damages of over $1.8 million for the Pagayons' claims. In accordance with the proportionate-responsibility statute, the trial court signed a judgment awarding the Pagayons seventy-five percent of the damages assessed by the jury. The trial court denied ExxonMobil's motion for new trial, and ExxonMobil appealed.

## II.  VICARIOUS V. DIRECT LIABILITY

In ExxonMobil's first two issues, it argues that it is entitled to rendition of a take-nothing judgment on the Pagayons' two theories of liability: vicarious liability as Cabulang's employer (also called "imputed" liability), and direct liability for negligent supervision. The distinction between these two theories is crucial to our analysis, because although the jury failed to find ExxonMobil vicariously liable, many of ExxonMobil's appellate arguments pertain only to that theory of liability rather than to the negligent-supervision theory of liability on which the judgment is based.

To impute liability to an employer for its employee's tort, the employee's act usually must fall within the course and scope of the employee's general authority

4

and must have been performed in furtherance of the employer's business. *See Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 493 (Tex. App.—Fort Worth 2002, no pet.). Intentional torts are not ordinarily within the scope of a worker's employment. *Cowboys Concert Hall-Arlington, Inc. v. Jones*, No. 02-12-00518-CV, 2014 WL 1713472, at *9 (Tex. App.—Fort Worth May 1, 2014, pet. denied) (per curiam, mem. op.). And as ExxonMobil points out, an employer ordinarily is not vicariously liable for the employer's intentional torts that are motivated by personal animosity. *See Wrenn*, 73 S.W.3d at 494 (citing *Tex. & P. Ry. Co. v. Hagenloh*, 151 Tex. 191, 197, 247 S.W.2d 236, 239 (1952)).

Unlike a claim of vicarious liability, a claim of negligent supervision does not depend on a finding that the employee committed the tort while acting in the course and scope of his employment. *See Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 100 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). In particular, an employer can be held liable under a negligent-supervision theory for its employee's intentional torts.

To illustrate this, we need only look to the test for determining whether the "duty" element of a negligent-supervision claim is satisfied. Where, as here, a claimant seeks to hold an employer liable under a negligent-supervision theory for an employee's actions that were outside the scope of his employment, the Texas Supreme Court has adopted the following test to determine whether the employer had a duty to use reasonable care to control the employee so as to prevent him from harming others:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from *intentionally harming others* or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a)    the servant

(i)     is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii)    is using a chattel of the master, and

(b)    the master

(i)     knows or has reason to know that he has the ability to control his servant, and

(ii)    knows or should know of the necessity and opportunity for exercising such control.

RESTATEMENT (SECOND) OF TORTS § 317 (1965) (emphasis added), adopted in *Kelsey-Seybold Clinic v. Maclay*, 466 S.W.2d 716, 720 (Tex. 1971), *superseded by statute on other grounds as stated in Helena Labs. Corp. v. Snyder*, 886 S.W.2d 767, 768 (Tex. 1994) (per curiam); *see also Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983) (including this section among other Restatement provisions in which, as a matter of law, a relationship imposes certain duties upon the parties); *accord*, *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404–05 (Tex. 2009). Thus, under a negligent-supervision theory, an employer that breaches this duty can be held directly liable for harm that is proximately caused by its employee's intentional conduct that is outside the scope of his employment.

Because the jury failed to find ExxonMobil liable on a theory of vicarious liability, we do not address ExxonMobil's arguments and authorities that pertain to that theory of liability rather than to the Pagayons' negligent-supervision claim. Specifically, we do not address ExxonMobil's arguments that liability cannot be imputed to it because the altercation was (a) based on intentional conduct or personal animosity, (b) unauthorized, (c) not in the course and scope of Cabulang's employment, or (d) not in the furtherance of ExxonMobil's business. We instead analyze only ExxonMobil's arguments that could require reversal of the judgment on the Pagayons' negligent-supervision claim.

6

## III. NEGLIGENT SUPERVISION

To prevail on a claim of negligent supervision, the Pagayons were required to prove that (a) ExxonMobil owed Alfredo a duty to supervise its employees, (b) ExxonMobil breached that duty, and (c) the breach proximately caused Alfredo's injuries. *See Knight v. City Streets, L.L.C.*, 167 S.W.3d 580, 584 (Tex. App.—Houston [14th Dist.] 2005, no pet.). In ExxonMobil's first issue, it argues that, as a matter of law, it had no duty to control Cabulang, and in its second issue, it contends that the evidence is legally insufficient to support the finding that its actions were a proximate cause of Alfredo's death. ExxonMobil also makes a subsidiary argument that we construe as an assertion that ExxonMobil fulfilled any duty that it owed to the Pagayons, or in other words, that it did not breach its duty.

To analyze the legal sufficiency of the evidence, we review the record in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). We will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810.

## A.  ExxonMobil's Duty

In its first issue, ExxonMobil contends that there is no evidence to support the imposition of a duty.  Whether a duty exists is generally a legal question for the court.  *See Nabors Drilling*, 288 S.W.3d at 404; *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex. 2002); *Otis Eng'g Corp.*, 668 S.W.2d at 312.  As previously discussed, the duty for an employer to use reasonable care to prevent its employee from harming others can arise if (1) the employee is on the employer's premises, (2) the employer knows it has the ability to control the employee, and (3) the employer "knows or should know of the necessity and opportunity for exercising such control."  RESTATEMENT (SECOND) OF TORTS § 317.  According to the uncontroverted evidence, Cabulang was on ExxonMobil's premises when he threatened physical violence and when he fought Alfredo, and store manager Roce Asfaw knew that she was authorized to exercise control over him, to reprimand him, send him home, or terminate his employment.  Thus, the question of whether ExxonMobil had a duty to use reasonable care to prevent Cabulang from intentionally harming others turns on whether there is legally sufficient evidence that ExxonMobil knew or should have known "of the necessity and opportunity for exercising such control" over Cabulang.  *See id.*

ExxonMobil asserts there is no evidence that it should have known of Cabulang's violent tendencies, thereby implying that it should not have known of the need and opportunity to exercise control over him.  But the evidence on this issue is uncontroverted; indeed, it consists largely of admissions by Asfaw.

First, Asfaw's testimony established that ExxonMobil knew or should have known of the need to control Cabulang.  Asfaw acknowledged that if she, as the store manager, were alerted to a threat of violence, then she should do something about it, and that failing to do so could pose a threat to others.  It is undisputed that

8

before the fight occurred, Asfaw *was* alerted to a threat of violence. Asfaw admits that she left the store before Cabulang arrived to work at around 3:30 p.m. to work a shift that overlapped with J.R.'s, and while she was away, Cabulang's co-worker Jovita Leslie telephoned her and said that Cabulang was threatening "to beat J.R. up" and asking him to go outside to fight. Asfaw agreed that such statements are threatening. Nevertheless, she did not tell Cabulang to stop, and she did not investigate the complaint.

Second, Asfaw's testimony established that she had the opportunity to exercise control over Cabulang. She acknowledged that J.R. continued working until around 4:30 p.m., and she admitted that she received the phone call about Cabulang's threats "long before" that time. Asfaw agreed that although she was not physically present at the store when she was told of Cabulang's threats, she still could have sent him home. Indeed, she conceded that, regardless of whether she believed the report of Cabulang's threats, the fight could have been avoided if she had just spoken to him.

This evidence distinguishes the facts of this case from those of the cases ExxonMobil cites in support of its argument that, as a matter of law, it had no duty to exercise reasonable care to prevent Cabulang from intentionally harming others. Here, the employee's manager had advance warning of his current violent tendencies, expressed through his verbal threats of physical violence while working on the employer's premises. There was no such evidence in the cases on which ExxonMobil relies. *See, e.g., Garrett v. Great W. Distrib. Co. of Amarillo*, 129 S.W.3d 797, 804 (Tex. App.—Amarillo 2004, pet. denied) (holding that employer has no duty to prevent employee from fighting unless it reasonably should have known of that particular employee's propensity for violence; thus, beer-distribution company's executive secretary's knowledge that "fights could

9

occur in a bar" or that two other employees had been involved in such a fight did not make it foreseeable that different employees would do so on a different occasion); *Dailey v. Albertson's, Inc.*, 83 S.W.3d 222, 229 (Tex. App.—El Paso 2002, no pet.) (explaining that a grocery store should not have foreseen its employee's physical assault of a customer where the assault was preceded only by the employee making loud comments about the customer's hair and following the customer from one check-out line to another); *Peek v. Equip. Servs., Inc.*, 906 S.W.2d 529, 532 (Tex. App.—San Antonio 1995, no writ) (holding that an employee's shooting of a customer was unforeseeable because although the employee was "nervous and sweating" on the day of the shooting, he had made no threats and acted "without warning"). In contrast to the holdings of these cases, we conclude that the evidence here establishes, as a matter of law, that ExxonMobil had a duty to exercise reasonable care to control Cabulang so as to prevent him from harming others.

## B.   Breach

Although not listed as a distinct issue, ExxonMobil also makes an argument that appears to be directed to the element of breach of duty. ExxonMobil states that although it had no duty, Asfaw nevertheless "did take precautions" by relaying instructions to J.R. to stay away from Cabulang. ExxonMobil implies that this was all that was required. But the duty at issue here was the duty to exercise reasonable care "to control the servant while acting outside the scope of his employment as to prevent *him* from intentionally harming others or from so conducting *himself* as to create an unreasonable risk of bodily harm to them." RESTATEMENT (SECOND) OF TORTS § 317 (emphasis added). The only person who expressed an intention to harm "others" or who is claimed to have posed an unreasonable risk of bodily harm to "others" was Cabulang; thus, ExxonMobil's duty was to exercise

10

reasonable care to control *Cabulang*. Moreover, the duty was owed not just to J.R., but to "others" who were similarly situated—including Alfredo. ExxonMobil asserts in its reply brief that it could not have foreseen that Cabulang would assault Alfredo because Asfaw was told only that Cabulang had threatened J.R. This, however, was sufficient, because for a result to be foreseeable, "[a]ll that is required is 'that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.'" *Motsenbocker v. Wyatt*, 369 S.W.2d 319, 323 (Tex. 1963) (quoting *Carey v. Pure Distrib. Corp.*, 133 Tex. 31, 35, 124 S.W.2d 847, 849 (1939)); *see also Mindi M. v. Flagship Hotel, Ltd.*, 439 S.W.3d 551, 557 (Tex. App.—Houston [14th Dist.] 2014, pet. pending) ("An employer is negligent if the employer hires, retains, or supervises an employee whom the employer knows, or by the exercise of reasonable care should have known, is unfit or incompetent, and whose unfitness or incompetence creates an unreasonable risk of harm *to others* because of the employee's job-related duties." (emphasis added)); *Watkins v. Basurto*, No. 14-10-00299-CV, 2011 WL 1414135, at *4 (Tex. App.—Houston [14th Dist.] Apr. 14, 2011, no pet.) (mem. op.) ("An employer has a general duty to control its employees . . . , and to adequately hire, train, and supervise employees to prevent injuries *to third parties* that are reasonably foreseeable." (emphasis added) (citations omitted)). As the facts of this case illustrate, relaying a message to one potential victim—J.R.—to "stay away" from Cabulang did not prevent Cabulang from harming someone else who was similarly situated.[1]

---

[1] ExxonMobil does not argue that J.R. and his father were not "similarly situated."

## C.    Proximate Cause

In its second issue, ExxonMobil asks us to reverse and render a take-nothing judgment because the evidence is legally insufficient to support the jury's finding that ExxonMobil's negligent supervision proximately caused Alfredo's death. Proximate cause consists of the elements of cause-in-fact and foreseeability. *See Doe v. Boys Club of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Cause-in-fact is shown by establishing that the negligent act or omission was a substantial factor in bringing about the injury; without the act or omission, harm would not have occurred. *See Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 221–23 (Tex. 2010); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act or omission created for others. *See D. Hous., Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). Thus, "before liability will be imposed, there must be sufficient evidence indicating that the defendant knew or should have known that harm would eventually befall a victim." *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 526 (Tex. 1990).

As the jury here was instructed, there can be more than one proximate cause of an event. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010). ExxonMobil does not contend otherwise. It instead implies that, as a matter of law, other events proximately caused the fight, and that the existence of these other causes negates the jury's finding that ExxonMobil's negligence was "a proximate cause" of the fight or of Alfredo's death. Specifically, ExxonMobil urges that its negligence cannot be a proximate cause of either event because, as a matter of law, (1) intentional conduct caused the fight rather than any act or omission by ExxonMobil; and (2) the store "merely provided the location for this assault to occur," so that Exxon Mobil was not the legal cause of this "personal-animus

incident." Stated in terms of the standard of review, ExxonMobil contends that "the evidence establishes conclusively the opposite of the vital fact." *See City of Keller*, 168 S.W.3d at 810.

These arguments are variations of ExxonMobil's assertion that it cannot be liable under a negligent-supervision theory if its employee acted intentionally and from personal animus. As previously explained, however, this is incorrect as a matter of law. The question of whether Cabulang's behavior was an intentional tort motivated by personal animus is relevant to the determination of whether he acted in the course and scope of his employment or in the furtherance of ExxonMobil's business. Those are elements necessary to establish vicarious liability, but not to establish ExxonMobil's direct liability under a negligent-supervision theory. As previously discussed, it is precisely because Asfaw was told that Cabulang made threats of violence while he was on the premises working that ExxonMobil had a duty to exercise reasonable care "to prevent him from *intentionally harming others* or from so conducting himself as to create an unreasonable risk of bodily harm to them." RESTATEMENT (SECOND) OF TORTS § 317 (emphasis added). Thus, even if Cabulang's conduct were intentional and motivated by personal animus, these would not be grounds on which to reverse the judgment on the Pagayons' negligent-supervision claim. *Cf. CoTemp, Inc. v. Hous. W. Corp.*, 222 S.W.3d 487, 492 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (plurality op.) ("Under the tort of negligent hiring, supervision, or retention, an employer who negligently hires an incompetent or unfit individual may be directly liable to a third party whose injury was proximately caused by the employee's negligent or *intentional* act." (emphasis added)).[2]

---

[2] This is not the only problem with ExxonMobil's argument. In addition, it appears to be contrary to the position it maintained at trial, where it argued that Cabulang did not cause the fight, but instead acted only in self-defense. Whether Cabulang caused the fight was a disputed

ExxonMobil also contends that its conduct was "too attenuated" from the fight to have proximately caused it, because the store was "just the location for an inevitable wrestling match," which occurred there "only because events and people coincided by chance inside the store." But the only evidence on these subjects is at odds with ExxonMobil's assertions. First, there is no evidence that the altercation was inevitable. Asfaw instead testified that if she had sent Cabulang home or simply spoken to him, then the altercation would not have occurred. Cabulang additionally testified that if he had just let J.R. and Alfredo walk out of the store, then there would have been no fight. Second, it was not a coincidence that the participants in the altercation were all inside the store; it instead was foreseeable to ExxonMobil, because it scheduled Cabulang and J.R. to work overlapping shifts, and it did not send Cabulang home after being informed that Cabulang was threatening J.R. It was foreseeable to ExxonMobil that a person "similarly situated" to J.R.—his father—would come to the store that afternoon, because Asfaw knew that Alfredo provided J.R.'s transportation. And it was foreseeable that J.R. and Alfredo would be in the store with Cabulang because Asfaw knew both that J.R. customarily waited inside the store for his father—a practice that she permitted—and that Alfredo customarily came inside the store when he arrived to drive J.R. home. The day of the altercation was no exception to this pattern: J.R. called his father when he finished working, and twelve minutes after he changed out of his uniform, Alfredo entered the store to pick him up.[3]

In sum, the store was the location where ExxonMobil's duty to supervise its employees arose, and the evidence supports the jury's finding that ExxonMobil's

question of fact. Moreover, the jury found that ExxonMobil, J.R., and Alfredo acted negligently, but it was not asked to find that anyone acted intentionally.

[3] Although ExxonMobil points out that its written "policies prohibit loitering inside the store," there is no evidence that J.R. did so.

14

negligence in supervising Cabulang was a proximate cause of the altercation, as described in more detail above. We thus reject ExxonMobil's argument that the store was "merely the location" of the fight and that its conduct was too attenuated to have been a proximate cause of Alfredo's death. We overrule this issue.[4]

## IV. DESIGNATION OF RESPONSIBLE THIRD PARTIES

In its third issue, ExxonMobil argues that the trial court erred by striking its designation of emergency-room physician Dr. Dang as a responsible third party.[5] The resolution of this issue turns on the interpretation and application of the proportionate-responsibility statute found in Chapter 33 of the Texas Civil Practice and Remedies Code and the health-care-liability statute found in Chapter 74 of the same code. We review the trial court's ruling de novo. *See Flack v. Hanke*, 334 S.W.3d 251, 261 (Tex. App.—San Antonio 2010, pet. denied) (sub. op.).

### A. Chapter 74's "Standard of Proof" v. Chapter 33's "Responsibility"

The parties principally join issue on the legal question of whether, to survive a motion to strike the designation of an emergency-room physician as a responsible third party, the designating defendant is required to produce evidence of simple negligence, or instead must produce evidence of "wilful and wanton" negligence. Under Chapter 74 of the Texas Civil Practice and Remedies Code governing health-care-liability claims, "the claimant bringing the suit" for damages arising from allegedly deficient emergency medical care cannot establish liability absent

---

[4] Having rejected ExxonMobil's arguments that it cannot be the proximate cause of Alfredo's death because (a) "intentional conduct" caused the fight, and (b) the store was merely the location of the fight, we do not reach its remaining argument under this heading, i.e., that "[a]ny reliance on the foreseeability of medical negligence cannot overcome these problems with causation."

[5] The parties sometimes refer to the trial court's ruling as a denial of ExxonMobil's motion to designate Dr. Dang as a responsible third party, and sometimes refer to it as a grant of the Pagayons' motion to strike the designation. Our record contains only an order granting the Pagayons' motion to strike the designation of Dr. Dang as a responsible third party.

15

proof that the physician or health-care provider deviated from the standard of care "with wilful and wanton negligence." *See* TEX. CIV. PRAC. & REM. CODE § 74.153 (West 2011). The parties dispute whether this is the correct standard to apply when measuring the sufficiency of ExxonMobil's response to a motion to strike its designation of an emergency-room physician as a responsible third party.

The Pagayons argue that the following provision from Chapter 74 applies:

**Standard of Proof in Cases Involving Emergency Medical Care**

In a suit *involving a health care liability claim against a physician* or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department . . . , *the claimant bringing the suit* may prove that the treatment or lack of treatment by the physician or health care provider *departed from accepted standards of medical care* or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, *with wilful and wanton negligence*, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

*Id.* (emphasis added). Citing this provision, the Pagayons moved to strike ExxonMobil's designation of Dr. Dang as a responsible third party solely on the ground that there was no evidence that Dr. Dang deviated from the standard of care "with wilful and wanton negligence."

ExxonMobil responded that the provisions of Chapter 74 should not affect the application of responsible-third-party practice because Chapter 74 is designed to apply to health-care-liability claims in which damages are sought directly from the physician or health-care provider. *See id.* § 74.001(2), (13) (West Supp. 2014) (defining "claimant" as "a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim," and defining a "health care liability claim" as "a cause of action against a health care provider or

physician for . . . claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury or death of a claimant"). In contrast, the proportionate-responsibility statute concerns "responsibility," not "liability," so that a person can be wholly or partially "responsible" for the harm at issue without being "liable" for the damages assessed as compensation for that harm. *Compare id.* § 33.011(3) (West 2015) ("'Liable defendant' means a defendant *against whom a judgment can be entered* for at least a portion of the damages awarded to the claimant." (emphasis added)) *with id.* § 33.011(6) ("'Responsible third party' means any person *who is alleged* to have caused or contributed to causing in any way the harm for which recovery of damages is sought . . . ." (emphasis added)). To determine that a person is "responsible," the factfinder need find only that the person "caus[ed] or contribut[ed] to cause *in any way* the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these." *Id.* § 33.003 (emphasis added).

## B. Chapter 74's "Standard of Proof" of Liability is Inapplicable

We agree with ExxonMobil that section 74.153 does not apply to the designation of Dr. Dang as a responsible third party. Since *Hood v. Phillips*, the Texas Supreme Court's seminal case defining a physician's standard of care, a single standard of care has applied to physicians: the question to be answered is whether the physician undertook "a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances." 554 S.W.2d 160, 165 (Tex. 1977). In answering that question, "[t]he circumstances to be considered include, but are not

17

limited to, the expertise of and means available to the physician-defendant, the health of the patient, and the state of medical knowledge." *Id.*

Section 74.153 of the Civil Practice & Remedies Code does not purport to change this *standard of care*; it instead provides the *standard of proof* that is required to establish liability for harm to a patient arising from the provision of emergency medical care, because with limited exceptions, one "who in good faith administers emergency care is not liable in civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.151(a) (West Supp. 2014); *see also Benish v. Grottie*, 281 S.W.3d 184, 191 (Tex. App.—Fort Worth 2009, pet. denied) ("Section 74.153's statutorily created *standard of proof* and the applicable *medical standards of care* are not the same thing."); *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 556 (Tex. App.—Dallas 2009, no pet.) (same); *Bosch v. Wilbarger Gen. Hosp.*, 223 S.W.3d 460, 464 (Tex. App.—Amarillo 2006, pet. denied) (same). Thus, when a claimant seeks to recover damages for harm caused by allegedly deficient emergency medical care, the legislature has heightened the standard of proof required to establish the health-care provider's liability. *See Bosch*, 223 S.W.3d at 464 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.153). Stated differently, Chapter 74 does not change the "acceptable standard of medical care"; it simply allows one providing emergency medical care to deviate from that standard by a wider margin before becoming liable in damages for its breach. But as discussed further below, even if an emergency-room physician has not deviated from the standard of care sufficiently to make him "liable" for damages, he nevertheless may have deviated from it sufficiently to make him "responsible."

18

**C.      Chapter 33's Definition of "Responsibility" Applies**

In contrast to section 74.153, the proportionate-responsibility statute does not address the standard of proof for a claimant to hold a defendant liable for damages.  It instead provides a means for comparing the extent of fault, providing the means for a defendant to reduce both its own liability and the claimant's recovery.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.012 (West 2015) (reducing the amount of a claimant's recovery); *id.* § 33.013 (reducing the amount of a liable defendant's liability).  Because the statute evidences the legislature's intent that the factfinder determine the "percentage of responsibility," its plain language requires the factfinder to compare the conduct of those who allegedly violated a legal standard—even if the plaintiff could not hold all of them liable for the resulting harm.  *See In re Transit Mix Concrete & Materials Co.*, No. 12-13-00364-CV, 2014 WL 1922724, at *2–3 (Tex. App.—Tyler 2014, orig. proceeding) (mem. op.) (agreeing that a motion to strike the designation of a responsible third party may be defeated without evidence of an "actionable act or omission" to "establish liability"; the designating party need only produce more than a scintilla of evidence that the third party is "responsible" for the claimant's injury or damage, as that term is used in the proportionate-responsibility statute (internal quotation marks omitted)).  We may not ignore such specific statutory language even where its application may render a plaintiff less than whole.  *See, e.g.*, *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 868–69 (Tex. 2009) (noting that the proportionate-liability statute is "apparently unconcerned with the substantive defenses of responsible third parties" that place them beyond the reach of the plaintiff).

Accordingly, we agree with ExxonMobil that for purposes of its response to the Pagayons' motion to strike, it was not required to raise a fact issue regarding

whether Dr. Dang, "with wilful and wanton negligence," violated the standard of care. On the other hand, we disagree with ExxonMobil that it needed only to raise a fact issue on whether Dr. Dang "caused or contributed to cause" Alfredo's death; that is, we disagree that *causation* is the sole question under Chapter 33. As the discussion above demonstrates, ExxonMobil needed to respond to the Pagayons' motion to strike by producing evidence sufficient to raise a fact question about whether Dr. Dang contributed to causing Alfredo's death in a manner encompassed by the proportionate-responsibility statute, such as by (1) negligent act or omission, (2) any defective or unreasonably dangerous product, (3) other conduct or activity that violates an applicable legal standard, or (4) any combination of these. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a).

## D. Sufficiency of the Evidence

Under the proportionate-responsibility statute, a motion to strike the designation of a responsible third party is warranted only if "there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage." *See id*. § 33.004(*l*). When measured by the correct standard, ExxonMobil produced sufficient evidence to defeat the Pagayons' motion to strike.

In its response, ExxonMobil asserted that in the opinion of its expert Dr. Casar, Dr. Dang breached the standard of care in three interconnected ways.

First, Dr. Casar contends that Dr. Dang misread a chest x-ray that was taken shortly after Alfredo arrived in the emergency room. Alfredo was born without a left lung, but according to Dr. Casar, Dr. Dang misinterpreted the chest x-ray showing this defect and instead diagnosed Alfredo with a hemothorax on that side, meaning that Dr. Dang believed that blood was collecting in the space between Alfredo's chest wall and his left lung. Dr. Casar stated in his report that the x-ray revealed three signs that could be "clearly viewed on the chest x-ray" and that were

20

"inconsistent with the diagnosis of hemothorax." Dr. Casar additionally stated that if Alfredo had been bleeding into his chest cavity, his blood pressure would have dropped, but instead, his blood pressure was elevated.

Second, Dr. Dang failed to order a CT scan of Alfredo's chest before attempting to insert a chest tube to drain the hemothorax that he believed existed. Regarding the failure to timely secure a CT scan of Alfredo's chest, Dr. Casar stated in his report only that "any prudent physician would have ordered a CT scan in order to acquire more information in regards to the chest x-ray," and that when the scan was actually performed, it revealed that Alfredo was born without a left lung and had a large hematoma from the unsuccessful attempt to place a chest tube.

Third, Dr. Casar opined that Dr. Dang breached the standard of care by attempting to insert a chest tube to drain the hemothorax. Dr. Casar stated that after the failed attempts to insert a chest tube, Alfredo was given ten milligrams of morphine for his resulting complaints of pain. Dr. Casar explained that a patient who is missing a lung and has pulmonary hypertension is "extremely sensitive to the depressing effects of narcotics and it comes as no surprise that the patient developed progressive respiratory failure that required intubation and mechanical ventilation." According to Dr. Casar, "This was a direct result of giving the patient narcotics to control the chest wall pain caused by the attempted insertion of a chest tube that should ha[ve] not been placed to begin with." He further stated that Alfredo developed multiple organ failures, most likely as a result of uncontrolled sepsis. He opined that although the source of the sepsis was not clear from the cultures obtained, the most likely source was an infected chest-wall hematoma that was directly caused by the attempted chest-tube placement. In Dr. Casar's opinion,

Dr. Dang's acts and omissions began a chain of medical complications that ultimately led to Alfredo's death.[6]

This evidence is sufficient to raise a question of fact as to whether Dr. Dang is responsible for at least a portion of the Pagayons' "alleged injury or damage," which is all that the statute requires. *See id.*

Although our dissenting colleague would conclude that the trial court did not err in granting the motion to strike because Dr. Casar was not familiar with the standard of care for an emergency-room physician, that is a conclusion concerning Dr. Casar's qualifications. *See Roberts v. Williamson*, 111 S.W.3d 113, 121–22 (Tex. 2003). But on appeal, no one has challenged Dr. Casar's qualifications to offer an expert opinion on the applicable standard of care—nor, so far as we can tell, did anyone do so in the trial court. Thus, any objection to his qualifications to render an expert opinion on the subject has been neither preserved nor presented. *See Croft v. State*, 148 S.W.3d 533, 544 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

Moreover, the dissent applies the wrong test. Whether Dr. Casar is qualified to testify on the causes and effects of a person's injuries would be measured by Texas Rule of Evidence 702. *See Roberts*, 111 S.W.3d at 121–22. The question to be answered is whether the party offering the expert's testimony has established that the witness "has 'knowledge, skill, experience, training, or education'

---

[6] We acknowledge that "if evidence presents 'other plausible causes of the injury or condition that *could* be negated, the [proponent of the testimony] *must* offer evidence excluding those causes with reasonable certainty.'" *See Crump*, 330 S.W.3d at 218 (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997) (alterations in original)). But, in determining whether the trial court erred in striking the designation of Dr. Dang as a responsible third party, we must consider the evidence before it at the time of that ruling. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(*l*). At this point in the proceedings, the trial court was not presented with evidence about other possible sources of sepsis; it was simply presented with Dr. Dang's opinion that even though cultures did not clarify the source of the sepsis, the chest-wall hematoma from the failed chest-tube insertion was the most likely cause.

22

regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996) (quoting TEX. R. EVID. 702). A physician from one school of practice may testify about the negligence of a physician of a different school of practice "so long as the 'subject of inquiry is common to and equally recognized and developed' in both fields." *Id.* at 152 (quoting *Hart v. Van Zandt*, 399 S.W.2d 791, 797 (Tex. 1965)). Thus, in determining whether a doctor is qualified to testify on the specific issue before it, the trial court "should not focus on the specialty of the medical expert." *Tenet Hosps. Ltd. v. Love*, 347 S.W.3d 743, 750 (Tex. App.—El Paso 2011, no pet.) (citing *Roberts*, 111 S.W.3d at 122). And here, Dr. Casar testified repeatedly—and without contradiction—that the standard of care for reading a chest x-ray is the same regardless of the physician's school of practice.

In rejecting Dr. Casar's opinion on the ground that he was not familiar with the standard of care for an emergency-room physician, the dissent follows the approach that we rejected in *Blan v. Ali*. In that health-care-liability case, the defendant physicians did not dispute that the opposing expert was "qualified by training and experience to offer expert testimony regarding the diagnosis, care and treatment of a neurological condition"; they simply argued that the opposing expert "does not know the standard of care as applied to emergency room physicians." 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.). But as we explained in *Blan*, that argument "ignores the plain language of the statute, which focuses *not* on the defendant doctor's area of expertise, *but on the condition involved in the claim*." *Id.* (emphasis in original) (quoting the predecessor to TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a) (West 2011)).[7] The expert in *Blan*

---

[7] Tellingly, this statute is entitled, "Qualifications of Expert Witness in Suit Against Physician," and provides as follows:

23

attested "that the standard of care he describes applies to *any* physician treating a patient suffering from a stroke and lupus, regardless of the physician's area of expertise." *Id.* (emphasis in original). Although in *Blan* we discussed the application of provisions in the health-care-liability statute concerning expert qualifications to testify regarding "the standards applicable to the 'illness, injury, or condition *involved in the claim*,'"[8] the inquiry is the same under Texas Rule of Evidence 702, that is, whether the expert is qualified to testify "regarding the specific issue before the court." *See Broders*, 924 S.W.2d at 153 (concluding that the trial court properly excluded expert testimony where the proponent failed to establish that the physician was qualified to opine "on cause in fact"); *see also Roberts*, 111 S.W.3d at 122 (concluding that the proponent established that a physician from a different school of practice "had experience and expertise regarding the specific causes and effects" of the decedent's injuries). And here, there is no issue before us regarding Dr. Casar's qualifications to opine that Dr. Dang breached the standard of care and proximately caused Alfredo's death

---

(a)  In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may *qualify* as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1)  is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2)  has knowledge of accepted standards of medical care for the diagnosis, care, or treatment *of the illness, injury, or condition involved in the claim*; and

(3)  *is qualified* on the basis of training or experience *to offer an expert opinion regarding those accepted standards of medical care*.

(emphasis added).

[8] *Id.* at 746 (quoting Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 2, sec. 14.01(a)(2), 1995 TEX. GEN. LAWS 985, 988, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 TEX. GEN. LAWS 847, 884).

24

through his misreading of the chest x-ray and his resultant attempts to treat Alfredo for a hemothorax he did not have.

In sum, we conclude the evidence is sufficient to raise a question of fact as to whether Dr. Dang caused or contributed to causing "in any way the harm for which recovery of damages is sought, whether by negligent act or omission . . . , by other conduct or activity that violates an applicable legal standard, or by any combination of these." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a). We accordingly sustain this issue.

## E.    Harm Analysis

Although we conclude that the trial court erred in striking ExxonMobil's designation of Dr. Dang as a responsible third party, the error is not reversible unless it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *See* TEX. R. APP. P. 44.1(a). By striking the designation of Dr. Dang as a responsible third party, the trial court removed Dr. Dang from the list of persons whose percentage of responsibility could be submitted to the jury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a).[9]    Thus, the result is analogous to charge error, which "is generally considered harmful if it relates to a contested, critical issue." *See Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). To determine if the error was harmful, we must examine the entire record. *See Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 & n.25 (Tex. 1998) (citing *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 821–22 (Tex. 1980) and *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914, 921 (Tex. 1979)); *Heritage Gulf Coast*

---

[9] Having removed that issue from the jury's consideration, the trial court also excluded evidence relevant to that determination.

25

*Props., Ltd. v. Sandalwood Apartments, Inc.*, 416 S.W.3d 642, 655 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Here, the extent to which Dr. Dang was responsible for "causing or contributing to cause in any way the harm for which recovery of damages is sought"[10] was such a "contested, critical issue." Medical records reflect that the Houston Fire Department evaluated Alfredo at the scene at 5:06 p.m. Responders were told that Alfredo had been punched in the face and the back. He was alert, and complained of swelling in his cheek and pain in his neck. He also had difficulty breathing. Alfredo was transported to the hospital's emergency room, arriving at 5:34 p.m. In medical records prepared at that time, the only complaints listed were "assault—punched on the left side of head and on the back." Alfredo also continued to be described as alert and oriented. He complained of pain in his face and lower back, but when CT scans of his brain and lumbar spine were performed later that evening, neither showed any injuries. No one contends that Cabulang struck Alfredo in the chest; that Alfredo fell on his chest; or that Alfredo's chest was injured in the fight.

But as Dr. Casar would have testified, something else happened in the emergency room. When Alfredo's vital signs were checked upon his arrival, it was discovered that he had no breath sounds from the lower left side of his chest, and he had an oxygen saturation of just 75%.[11] Dr. Dang ordered a chest x-ray, which

---

[10] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a).

[11] There are many inconsistencies in the medical records. To cite a few examples, Dr. Dang's handwritten notes identify Alfredo himself as the person from whom Dr. Dang obtained Alfredo's medical history; other records identify the family as the historian. Dr. DeSantos stated on the radiology report that Alfredo was referred for a chest x-ray due to chest pain, but this was not listed among Alfredo's complaints. Although Dr. Clavijo was not present when Alfredo arrived at the hospital, he wrote that Alfredo was confused and disoriented at that time; however, before Dr. Dang administered sixteen milligrams of morphine as discussed *infra*, Alfredo was consistently described as alert and oriented by those who evaluated him at ExxonMobil and by

26

was performed at 6:08 p.m.  The radiologist, Dr. Luis DeSantos, read the x-ray and commented that the "left hemithorax is completely opaque and there is displacement of the mediastinum toward the right side suggesting the presence of a large amount of fluid in the left hemithorax with displacement of the mediastinum."  Dr. Dang reviewed the x-ray and concluded that Alfredo had a hemothorax.  Although this conclusion was consistent with Dr. DeSantos's observations, it was Dr. Dang who actually diagnosed Alfredo as having a hemothorax.

It is undisputed, however, that this diagnosis was wrong.  Alfredo did not have a hemothorax; he was born without a left lung.  Dr. Casar would have testified that Dr. Dang breached the standard of care by misreading the x-ray in that he failed to note the signs that Alfredo did not have a hemothorax and had only one lung.  Even Dr. Clavijo, the Pagayons' testifying medical expert, wrote in his own consultation notes, "Chest x-ray showed absence of left lung."

According to Dr. Casar, Alfredo's medical complications and eventual death arose from Dr. Dang's misreading of the chest x-ray and his resultant efforts to treat a condition that Alfredo did not have (a hemothorax), while failing to take into consideration the condition that Alfredo did have (a missing lung).[12]  The evidence of Dr. Dang's actions and their consequences is as follows:

---

the emergency-room personnel.  Our description of the evidence is intended only to show our reasons for concluding that the extent of Dr. Dang's responsibility, if any, for causing or contributing to Alfredo's death was a contested, critical issue.

[12] Even if a chest CT scan were needed to properly diagnose Alfredo's true condition and rule out a hemothorax, evidence supports Dr. Casar's opinion that Dr. Dang had time to have the scan performed.  Dr. DeSantos made his comments on the chest x-ray at approximately 6:10 p.m., and Dr. Dang did not administer the first dose of morphine in preparation for the chest tube until 6:42 p.m.—a time lapse of thirty-two minutes.  Medical records also show that Dr. Dang finally ordered a chest CT scan at 8:31 p.m., and that it was completed at 8:53 p.m.—a time lapse of just twenty-two minutes.  Thus, the record supports the conclusion that if Dr. Dang had ordered a chest CT scan after seeing the unusual chest x-ray, the extra procedure would not have

Dr. Dang stated in his notes that Alfredo was given morphine for the attempted insertion of a chest tube to drain the excess fluid that Dr. Dang believed was collecting in Alfredo's chest. Alfredo was given the first dose of four milligrams of morphine at 6:42 p.m., four minutes before Dr. Dang's first attempt to insert a chest tube. He attempted to insert a chest tube at 6:46 p.m. and again at around 6:52 p.m. After these attempts, Alfredo's primary complaint of pain no longer concerned his face or back, and he instead complained of pain at the site where Dr. Dang had attempted to insert the chest tube. Dr. Dang responded with more morphine. Sixteen minutes after Dr. Dang's second attempt to insert a chest tube, Alfredo was given four more milligrams of morphine, and twenty minutes after that, Alfredo was given a further six milligrams of morphine. Thus, in connection with his attempt to insert a chest tube, Dr. Dang caused Alfredo to be given a total of fourteen milligrams of morphine in the space of forty-six minutes. Dr. Casar would have testified that when a dose of about eight milligrams is given to someone with only one lung, it can be expected that the patient will stop breathing. He stated that although Alfredo was given a medication to reverse the effects of morphine and "for a little bit he became more responsive,"[13] his condition continued to deteriorate, and he had to be placed on a respirator. At 12:20 a.m. on August 2, 2011, Dr. Dang wrote in Alfredo's progress notes,

delayed the insertion of the chest tube if the CT scan had confirmed his diagnosis of a hemothorax. We note, however, that it is unclear what role the chest CT scan played in Dr. Dang's treatment of Alfredo. Although other doctors state in their notes that the CT scan "confirmed" that Alfredo had only one lung, the CT scan is not mentioned in Dr. Dang's narrative. He instead wrote, "Wife arrive to ER many hours later and I was informed that patient was born w/o one lung, but they are not sure which side."

[13] At 11:30 p.m., Dr. Dang wrote that Alfredo was asleep and was given Narcan, a drug which, as Dr. Casar explained in his deposition, was intended to reverse the effects of morphine. After writing that Narcan was given, Dr. Dang wrote "patient continues to be drowsy → more alert now." The time of this entry was also stated to be 11:30 p.m. (or as written in the records, 2330 pm).

"Discuss [with] Dr. Fisher about events in E.R. Agrees to admit → observation for pain controll [sic]." But here, too, the testimony of the Pagayons' expert Dr. Clavijo is consistent with Dr. Casar's proffered testimony rather than with Dr. Dang's notes. Dr. Clavijo testified that Alfredo was admitted to the hospital from the emergency room for observation and for somnolence, because Alfredo "was just entirely . . . lethargic."

Alfredo was admitted "to the floor" of the hospital, but shortly after his arrival, he suffered acute respiratory failure and was transferred to the intensive-care unit where Dr. Clavijo intubated him at 8:20 a.m. Dr. Clavijo testified that Alfredo was intubated because he was hypoventilating, meaning that his body could not get rid of carbon dioxide. Dr. Clavijo testified that hypoventilating "causes somnolence and lethargy and, subsequently, complete respiratory failure," but he identified no injuries that Alfredo received in the fight that could have caused hypoventilation. He further testified that Alfredo was never able to be weaned off of intubation, and that continuing intubation was a problem because this leaves tubes in the patient's body that can cause infection and further complications—including, in Alfredo's case, "a sepsis-type of infection." According to Dr. Clavijo, Alfredo's respiratory failure also caused his other systems to shut down. Dr. Casar, Dr. Clavijo, and Alfredo's death certificate all identify respiratory failure as one of the causes of Alfredo's death.

Finally, Dr. Clavijo agreed that "the trauma . . . that occurred on August 1, at Exxon, it kind of set off *a chain of events* that caused this respiratory failure that then caused [Alfredo's] renal failure and that eventually resulted in his death." (emphasis added). The "trauma" sustained "at Exxon" was not identified, and the jury did not hear the evidence that the events in this chain included Dr. Dang's alleged negligence in misreading Alfredo's chest x-ray, failing to observe that

29

Alfredo had only one lung, attempting to insert a chest tube, and administering morphine in doses high enough to cause respiratory failure. Jurors also did not hear Dr. Casar's testimony that the injuries Alfredo received in the fight did not cause his death, and that Alfredo's death instead was caused by Dr. Dang's negligence. And because the question of Dr. Dang's responsibility was removed from the case by the trial court's striking of the designation, the jury was unable to consider this hotly contested issue.

The Pagayons contend that even if Dr. Dang made errors that increased the harm to Alfredo or led to his death, Exxon would still bear the liability for the doctor's negligence under the "original tortfeasor rule." *See, e.g.*, *Cannon v. Pearson*, 383 S.W.2d 565, 567 (Tex. 1964) ("It has long been an accepted and established in this State that one who wrongfully injures another is liable in damages for the consequences of negligent treatment by a doctor or surgeon selected by the injured person in good faith and with ordinary care."); *Galvan v. Fedder*, 678 S.W.2d 596, 598 (Tex. App.—Houston [14th Dist.] 1984, no writ) (same). But as the Texas Supreme Court recently pointed out, the legislature "has overhauled Texas's system for apportioning fault in negligence cases" over the past four decades, enacting a comparative-negligence statute, which was replaced by a comparative-responsibility statute, and which has since been modified to become our current proportionate-responsibility statute. *See Nabors Well Servs., Ltd. v. Romero*, No. 13-0136, 2015 WL 648858, at *1, *4 (Tex. Feb. 13, 2015). By its terms, the proportionate-responsibility statute applies to "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." TEX. CIV. PRAC. & REM. CODE ANN. § 33.002(a)(1) (West 2015). The Pagayons asserted causes of action based on tort, and the jury determined ExxonMobil's

percentage of responsibility; thus, the proportionate-responsibility statute governs the determination of responsibility in this case.[14] For the reasons we have described, we conclude that ExxonMobil was harmed by the trial court's erroneous application of the statute in striking the designation of Dr. Dang as a responsible third party.

We sustain this portion of ExxonMobil's third issue. Because we conclude that this error requires us to reverse the judgment and remand the case for a new trial, we do not reach ExxonMobil's remaining issues.

## V. CONCLUSION

Although the evidence is legally sufficient to support the jury's liability finding against ExxonMobil under a negligent-supervision theory, we conclude that the trial court erred in striking the designation of Dr. Dang as a responsible third party, and that this error harmed ExxonMobil. Thus, without reaching ExxonMobil's remaining issues, we reverse the judgment and remand the case for a new trial consistent with this opinion.


/s/    Tracy Christopher
Justice

Panel consists of Justices Christopher, McCally, and Wise (McCally, J., dissenting).

---

[14] Although the statute contains a few exceptions to its broad application, the Pagayons do not contend that any of the enumerated exceptions applies. *See id.* § 33.002(c) (providing that Chapter 33 does not apply to actions for workers' compensation benefits, claims for exemplary damages, or claims arising from the manufacture of methamphetamine).

31

**Reversed and Remanded Opinion and Dissenting Opinion filed April 9, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00456-CV

---

### EXXONMOBIL CORPORATION, Appellant

### V.

### DELIA PAGAYON, MICHELLE FULTON, ALFREDO G. PAGAYON, MICHAEL G. PAGAYON, AND THE ESTATE OF ALFREDO M. PAGAYON, Appellees

---

**On Appeal from the Probate Court No. 2**
**Harris County, Texas**
**Trial Court Cause Nos. 408,329-401 & 408,329**

---

## DISSENTING OPINION

I agree with the Majority's determination that for purposes of its response to the Pagayons' motion to strike, ExxonMobil was not required to raise a fact issue regarding whether Dr. Dang, with willful and wanton negligence, violated the standard of care. I disagree, however, with the Majority's conclusion that ExxonMobil raised a fact issue concerning Dr. Dang's alleged negligence in

providing emergency care to Alfredo. Because I would instead conclude that the trial court did not err in striking Dr. Dang's designation, I respectfully dissent.

Though the trial court did not articulate its basis for striking the designation of Dr. Dang in its order, there are two independent reasons that the decision is not error. The trial court would not have erred in concluding that the medical opinion ExxonMobil offered to raise a fact issue on Dr. Dang's alleged departure from the standard of care was not probative opinion testimony in that (1) the "expert" disclaimed knowledge of the applicable standard of care and (2) the physician's "expert opinion" was based upon assumed facts that varied from the actual, underlying facts .

1. *The basis for the "expert opinion" that Dr. Dang fell below the standard of care*

The medical record relied upon by Dr. Casar reflects that Alfredo arrived at the hospital's emergency room via EMS at 17:58.[1] The record also shows injury to the left back and decreased breath sounds on the lower left side. The radiology report also relied upon by Dr. Casar confirms that Dr. Dang immediately ordered a chest x-ray due to chest pain, and the x-ray was performed at 18:08. The radiologist, Dr. Luis DeSantos, read the x-ray at 18:10 and provided a diagnosis of "[c]omplete opacification of the left hemithorax" and commented that the "left hemithorax is completely opaque and there is displacement of the mediastinum toward the right side suggesting the presence of a large amount of fluid in the left hemithorax with displacement of the mediatinum." At 18:46 the emergency room

---

[1] The entirety of Alfredo's medical records were not included as part of the motion-to-strike record. Only a two page "Emergency Provider Record" and the "Diagnostic Radiography" report are provided as the basis for Dr. Casar's opinion.

2

records show "chest tube insertion because of hemothorax."[2] In fact, Alfredo had no left lung and the x-ray was misread. According to Dr. Casar, Dr. Dang fell below "the standard of care" when, faced with what, in Dr. Casar's opinion was, an unusual x-ray, Dr. Dang failed to wait for a CT scan before deciding to attempt insertion of a chest tube. Dr. Casar stated that "[a]fter the CT Scan was obtained, it became clear that the patient had a congenital absence of the left lung."

## 2. The "expert" disclaims knowledge of the standard of care

Problematic to the above evidence is Dr. Casar's testimony that he is not familiar with the standard protocol for emergency room physicians when they believe they are confronted with a hemothorax and his assumption about the timely availability of diagnostic tools in the emergency room. First, Dr. Casar's field of expertise is critical care medicine, which he concedes has a different standard of care than emergency room medicine. Standing alone, the fact that Dr. Casar's expertise is in a different area is not fatal if Dr. Casar demonstrates knowledge of the area at issue. *See* Tex. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."); *cf. Blan v. Ali*, 7 S.W.3d 741, 745–46 (Tex. App.—Houston [14th Dist.] 1999, no pet.). But Dr. Casar repeatedly testified that he does not know the standard of care for an emergency room physician. Although Dr. Casar testified that, in his opinion, the standard of care for reading an x-ray is the same despite the diagnostic setting, he also stated that he was not familiar with the standard of care for an emergency room physician. When Dr. Casar admitted that he does not know

---

[2] According to Dr. Casar, the thorax is the space between the waist and the neck; a hemothorax is a thorax full of blood, which means that something is bleeding inside, and it is a condition that may be life-threatening if not treated promptly.

the standard for an emergency room physician, he caused his own opinion that the standards are the same to be completely without foundation. In other words, if he does not know what the emergency standard is, he cannot know that the emergency standard is the same as the non-emergency standard.

Where the treatment criticized is provided as part of emergency care, the expert should demonstrate familiarity with that standard of care, not simply guess that the setting for care does not matter. *Cf. Ly v. Austin*, No. 03-05-00516-CV, 2007 WL 2010757, at *5 (Tex. App.—Austin July 13, 2007, no pet.) (mem. op) (holding that when the specific issue before the court is "the standard of care applicable to neurologists providing emergency care immediately following a stroke," testimony from an expert in caring for stroke patients in rehabilitative setting is insufficient). Thus, in my view, Dr. Casar must know the applicable standard of care—in this case, what a reasonably prudent emergency room physician would have done in the same or similar circumstances—to support the designation of Dr. Dang as a responsible third party.

In short, Dr. Casar admitted he has neither the expertise nor the knowledge of reading x-rays or making critical decisions in an emergency room setting. Thus, I would conclude that the trial court did not err in determining that Dr. Casar lacked the requisite knowledge, skill, experience, training, or education to opine on the emergency care provided to Alfredo. *See* Tex. R. Evid. 702; *cf. Ehrlich v. Miles*, 144 S.W.3d 620, 625 (Tex. App.—Fort Worth 2004, pet. denied) ("A medical expert who is not of the same school of medicine, however, is competent to testify if he has practical knowledge of *what is usually and customarily done by a practitioner under circumstances similar to those confronting* the [allegedly negligent physician]." (emphasis added)).

The majority urges that, notwithstanding Dr. Casar's admission that he is not familiar with the applicable standard, we may not affirm on this basis because the Pagayon's did not object to Dr. Casar's qualifications. I disagree factually and legally. Counsel for the Pagayons consistently and persistently pointed out Dr. Casar's lack of qualification before the trial court:

> Q. Certainly, an emergency room physician's practice is very different from your practice as a critical care doctor, correct?
>
> . . .
>
> A. It is different, yes.
>
> . . .
>
> Q. You don't practice in the ER, correct?
>
> A. I practice in ICU.
>
> Q. Okay.
>
> A. Not in the ER.
>
> Q. So you don't know what the standard protocol is for emergency room physicians when they believe they have a hemothorax is, do you?
>
> A. I don't know what their standard is.
>
> . . .
>
> Q. But – but for the emergency room. You don't know the emergency room standard – you're – you're basing your understanding of the ICU standard with the ER standard, fair?
>
> A. Fair.
>
> Q. That's not necessarily fair to the doctors is it? Because you agree with me that an ICU setting is different from emergency room setting, fair?
>
> . . .
>
> A. It is different, yes.
>
> Q. And so, sitting here today, you don't know what the standard protocol is for an emergency room physician?

5

A. I don't – I don't know what the standard of care is for an emergency room physician.

. . .

Q. Again, you're not familiar with the standard of care in the emergency room?

. . .

A. I'm not sure if – what the standard of care for the emergency room, but I would be surprised if it's any different.

Q. But I just want to make sure.

You're not qualified to testify on the standard of care in an emergency room?

. . .

A. I don't know what the standard of care in the emergency room is.

Thus, in my view, the Pagayons placed Dr. Casar's qualification at issue. Here, we are not faced with an alleged error on the admissibility of Dr. Casar's opinion. The trial court did not exclude the evidence. Instead, as the Texas Supreme Court has recently pointed out, the question is whether the expert's opinion is any evidence at all. *Cf. Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 832–33 (Tex. 2014) ("[I]f no basis for the opinion is offered, or the basis offered provides no support, the [expert] opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." (internal quotation and citation omitted)).

Further, the nature of the opinion Dr. Casar proffers is, in the words of our opinion in *Blan v. Ali*, "peculiar to the field" of emergency medicine about which he knows nothing. 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.). As noted above, Alfredo was admitted to the emergency room at 5:58 p.m. Dr. Dang testified that he "was very concerned about [Alfredo]'s medical condition and believed that if [he] did not take immediate medical action,

6

[Alfredo]'s health could have been placed in serious jeopardy." Dr. Dang performed a physical examination and obtained a chest x-ray at approximately 6:08 p.m., which, as noted above, revealed complete opacification of the left hemithorax. Dr. Dang's interpretation of the chest x-ray was confirmed by Dr. DeSantos. Further, as Dr. Dang testified,

> Based on, among other things, the x-ray, Mr. Pagayon's medical condition, and *his need for emergency care*, I made the decision to place a chest tube to drain what I believed to be a hemothorax in his left lung. . . . *Based on the circumstances and the emergency situation*, I made the determination that there was not time to perform a CAT scan prior to placing the chest tube. In my training and experience when dealing with what one believes to be a hemothorax, the same must be addressed as soon as possible.

(emphasis added). Thus, according to Dr. Dang—and acknowledged by Dr. Casar—Dr. Dang was providing emergency medical care when he attempted the chest tube insertion. Dr. Casar's admission that he does not know the standard of care for emergency room physicians is "determinative." *See id.*

### 3. The "expert opinion" rests on misperceived facts

Second, Dr. Casar repeatedly displayed his unfamiliarity with the facts of Alfredo's care in his deposition testimony. *Cf. Houston Unlimited, Inc. Metal Processing*, 443 S.W.3d at 822 ("If an expert's opinion is unreliable because it is 'based on assumed facts that vary from the actual facts,' the opinion 'is not probative evidence.'" (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex. 1995)). If the factual assertions or assumptions underlying an expert's opinion are contrary to the facts, opinion testimony founded on those

7

assumptions is not competent evidence. *Cf. id.* at 833. Here, Dr. Casar's opinion was based on assumptions contrary to proven facts in several respects.[3]

For example, Dr. Casar was mistaken about the time and dosages of morphine provided to Alfredo: Dr. Casar initially stated that the morphine was still in Alfredo's system when he was intubated, but when confronted with Alfredo's medical records that established the contrary, Dr. Casar acknowledged that morphine was "probably not" still in Alfredo's system when he was later intubated in the ICU. Dr. Casar also testified that Alfredo's respiratory rate was 32 breaths per minute, an elevated rate, when he was admitted to the ICU. But when confronted with Alfredo's records, Dr. Casar stated that the record showed Alfredo's breath rate was 24 breaths per minute. Further, he testified that there was a note in Alfredo's medical records that Afredo could be released that "afternoon" from the emergency room.[4] Yet, the doctor was unable to find this note when given an opportunity to search through the records. Finally, Dr. Casar's criticism of Dr. Dang's failure to wait for a CT scan to confirm his hemothorax diagnosis emanated from his belief that "in the emergency room, you can get a CAT scan in 15 minutes." But the following exchange occurred during Dr. Casar's deposition:

---

[3] The "facts" as proven at the time of the motion to strike did not include Alfredo's entire medical records. Instead, these "facts" included Dr. Casar's deposition testimony and a few pages from Alfredo's records. Thus, although the Majority notes several facts from Alfredo's medical records in its harm analysis, those facts were not part of the record when the trial court implicitly determined that Dr. Casar's opinion testimony failed to raise a fact issue regarding Dr. Dang's purported responsibility. In other words, the Majority has reviewed the trial court's alleged error based upon a record that was not before the trial court at the time it made the challenged ruling. Moreover, the facts the Majority draws from the expanded record are facts neither articulated, nor apparently known, by Dr. Casar at the time he supplied the deposition testimony ExxonMobil presented to the trial court.

[4] As noted above, Alfredo was admitted to the emergency room at 17:58, which is 5:58 p.m. Thus, it does not appear that Alfredo was in the emergency room in the "afternoon."

8

Q. You also testified he had a CT scan less than an hour after . . . after the chest tube.

Remember that?

A. Yes.

Q. That's not the case, is it, Doctor?

A. I said I don't remember exactly the time line.

Q. In fact, let me show you what's . . . previously been marked as Exhibit No. 37.

A. Okay.

Q. And he didn't have a CT scan until 8:53 that night, more than two hours —

A. Two hours. Well, that's terrible.

Q. More than two hours, correct?

A. That's terrible.

Q. And more than three hours after his initial . . . consult, right?

A. Yeah. So, you see — uh-huh.

Q. You can't wait three hours for a CAT scan, can you doc?

A. Well, they waited and nothing happened.

Q. If you can get a CAT scan at the snap of a finger, as you claim you can —

A. Yeah. You should be able to here.

Q. Took two hours here?

A. Right.

Q. And they ordered one immediately, and it took two hours?

A. That's not good. That's not good. That's not what it [sic] should happen in an emergency room.

***

Q. Would you like to correct your testimony wherein you stated he received a CAT scan 30 minutes after his chest tube?

A. Yes.

9

In summary, Dr. Casar did not indicate that he was familiar with the facts of Alfredo's care. Instead, the record before the trial court indicates that he based his conclusions on either improper recollections of the facts or assumptions. *See id.*; c*f. Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010) (holding that the basis for an expert's opinion must be linked to the facts).

*4. Conclusion*

I would conclude, after considering Dr. Casar's testimony as a whole, that Dr. Casar's opinions do not raise a fact question regarding whether Dr. Dang failed to act as a reasonably prudent physician under the same or similar circumstances. Although Exxon Mobil offered Dr. Casar's opinion on emergency room treatment in an emergency situation, Dr. Casar did not undertake to analyze Dr. Dang's conduct in the context of the circumstances of emergency care. As such, Dr. Casar's statements that he does not know the emergency room standard of care is determinative. *Cf. Ehrlich*, 144 S.W.3d at 625; *Blan*, 7 S.W.3d at 746 (noting that expert's admission that he was unfamiliar with the emergency room and cardiology standards of care would be "persuasive, if not determinative *if* [he] were purporting to offer expert medical opinions in matters peculiar to the fields of cardiology or emergency medicine"). Dr. Casar's testimony completely misses the mark regarding whether Dr. Dang's care of Alfredo fell below the standard of care for a reasonably prudent physician in an emergency room setting. Indeed, Dr. Casar's testimony demonstrated he was unfamiliar with the actual facts surrounding Alfredo's medical care. *Cf. Houston Unlimited, Inc. Metal Processing*, 443 S.W.3d at 832–33; *Jelinek*, 328 S.W.3d at 539. Thus, I would conclude that Dr. Casar's opinion is no evidence of Dr. Dang's responsibility for Alfredo's death.

In sum, I agree with the Majority that ExxonMobil did not need to bring forth evidence that Dr. Dang willfully and wantonly departed from the standard of

care. But ExxonMobil nonetheless needed to bring forth some probative evidence that Dr. Dang departed from the applicable standard of care. Because ExxonMobil failed to do so, I would conclude that the trial court did not err in striking the designation of Dr. Dang. Because the Majority concludes otherwise, I respectfully dissent.


/s/    Sharon McCally
Justice

Panel consists of Justices Christopher, McCally, and Wise (Christopher, J., majority).

11